Richard GAMMEL, Individually and on
Behalf of All Others Similarly
Situated, Plaintiff,

v.

HEWLETT–PACKARD COMPANY,
et al., Defendants.

Case No. SACV 11–1404 AG (RNBx).

United States District Court,
C.D. California.

Aug. 29, 2012.

Brian Oliver O'Mara, Catherine J. Kowalewski, Darren J. Robbins, David C. Walton, Robbins Geller Rudman and Dowd LLP, San Diego, CA, Mark I. Labaton, Motley Rice LLP, Los Angeles, CA, for Plaintiff.

Jennifer R. Bagosy, Robert Elliot Gooding, Jr., Morgan Lewis and Bockius LLP, Irvine, CA, Karen Pieslak Pohlmann, Marc J. Sonnenfeld, Morgan Lewis & Bockius LLP, Philadelphia, PA, Monique E. Cho, Morgan Lewis and Bockius LLP, Laura Danielle Smolowe, Munger Tolles & Olson LLP, Los Angeles, CA, Boris Feldman, Brian Danitz, Katherine L. Henderson, Steven M. Schatz, Wilson Sonsini Goodrich & Rosati PC, Palo Alto, CA, Kevin P. Muck, Marie Bafus, Fenwick and West LLP, San Francisco, CA, for Defendants.

## ORDER GRANTING MOTIONS TO DISMISS

ANDREW J. GUILFORD, District Judge.

Lead Plaintiffs Arkansas Teacher Retirement System, Union Asset Management Holding AG, Labourers' Pension Fund of Central and Eastern Canada, and the LIUNA National Pension Fund and LIUNA Staff & Affiliates Pension Fund (together, "Plaintiffs") filed a First Amended Complaint ("FAC") in this securities fraud class action in February 2012 against Defendants Hewlett Packard Com-

pany ("HP"), Leo Apotheker, Catherine Lesjak, and R. Todd Bradley (together, "Defendants"). Before the Court are the separate Motions of HP and Apotheker, Lesjak, and Bradley (together, "Individual Defendants") to Dismiss Plaintiffs' FAC. The Motions are GRANTED.

## BACKGROUND

The following facts are taken from Plaintiffs' FAC, and as it must for purposes of these Motions, the Court assumes them to be true.

HP is one of the world's largest information technology companies and the world's leading vendor of personal computers ("PCs") and printers. (FAC ¶¶ 1, 25.) Apotheker served as HP's President and Chief Executive Officer from November 2010 until his termination in September 2011. (*Id.* ¶ 26.) Lesjak has been HP's Chief Financial Officer since 2007. (*Id.* ¶ 27.) Bradley has been the Executive Vice President of HP's largest business segment, the Personal Systems Group ("PSG"), since 2005. (*Id.* ¶¶ 3, 28.) Plaintiffs purchased HP common stock during the proposed Class Period—November 22, 2010 to August 18, 2011—and suffered losses due to Defendants' alleged securities law violations.

This lawsuit arises out of HP's failed strategy to develop an "ecosystem" of integrated mobile computing devices—including PCs, printers, smartphones, and tablets—running on an operating system known as "webOS."

As Plaintiffs allege in their FAC, HP's hardware products have traditionally run on Microsoft's ubiquitous Windows operating system. (*Id.* ¶¶ 3, 4.) By contrast, hardware products made by HP's competitors, like Apple and Google, run on "unique proprietary" non-Windows operating systems. (*Id.* ¶ 4.) According to Plaintiffs, "HP wanted to get in on the action." (*Id.* ¶ 5.) So in July 2010, for $1.2 billion, HP bought Palm, Inc. ("Palm")—maker of the once-popular PalmPilot handheld computing device—and exclusive rights to Palm's webOS operating system. (*Id.*)

"With webOS," say Plaintiffs, "HP would be in control of both its hardware and software for the first time in its long history . . . giv[ing] itself a golden opportunity to break free from the relatively stagnant market for Widows PCs." (*Id.* ¶ 7.) Thus, "[l]ike Apple, HP would offer its customers a unified user experience across a range of elegant devices, with webOS ultimately supporting and connecting the user's smartphone, tablet, PC and printer in a fully integrated and flexible ensemble of devices." (*Id.* ¶ 8.)

But while Defendants were publicly touting HP's "commitment to developing and integrating its webOS products," Plaintiffs allege that things were very different behind the scenes. According to Plaintiffs, there were "no operational plans to develop and sell [webOS PCs and printers]" and HP's "flagship webOS product, the 'TouchPad' tablet' . . . was riddled with hardware and software defects" that HP failed to disclose. (*Id.* ¶¶ 8, 9.)

Plaintiffs allege that the webOS house of cards came crashing down on August 18, 2011, when "HP abruptly reversed course and announced that it was shutting down all of its webOS hardware operations." (*Id.* ¶ 13.) HP's stock dropped six percent that day and an additional 20 percent on August 19, 2011. (*Id.* ¶ 14.) Apotheker was fired less than a month later, and in December 2011, after writing off more than $3 billion in webOS-related costs, HP "contribut[ed] webOS to the public as 'open-source' software for anyone to use and develop." (*Id.* ¶ 15.)

Based on these allegations and others, Plaintiffs assert claims against Defendants under §§ 10(b) and 20(a) and Rule 10–5 of the Securities and Exchange Act of 1934

("Exchange Act"). 15 U.S.C. §§ 78j(b), 78t(a); 17 C.F.R. § 240.10b–5.

### PRELIMINARY MATTERS

To support their Motions, Defendants request that the Court take judicial notice of the following 12 items: (1) excerpts from HP's December 2010 Form 10–K; (2) a transcript of HP's February 22, 2011 Earnings Call; (3) excerpts from HP's March 11, 2011 Form 10–Q; (4) a transcript of HP's March 14, 2011 Summit Press Conference; (5) a transcript of HP's March 14, 2011 Strategy Summit; (6) a transcript of HP's May 17, 2011 Earnings Call; (7) a June 1, 2011 *All Things Digital* article titled "HP CEO Leo Apotheker Says He Won't Ship TouchPad Till It's Perfect"; (8) excerpts from HP's June 8, 2011 Form 10–Q; (9) a transcript of HP's August 18, 2011 Earnings Call; (10) excerpts from HP's December 14, 2011 Form 10–K; (11) a March 21, 2012 HP Press Release; and (12) an August 19, 2011 *All Things Digital* article titled "With HP's Raising of the World's Biggest White Flag, Will Jon Rubinstein and Todd Bradley Surrender too?" (the "August 19, 2011 Article").

Alternatively, Defendants request that the Court consider, under the incorporation by reference doctrine, those documents referenced in, but not attached to, Plaintiffs' FAC. Plaintiffs oppose Defendants' request for judicial notice and consideration of items 11 and 12 only.

■ Under Federal Rule of Evidence 201, "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R.Evid. 201. Courts may take judicial notice of "*undisputed* matters of public record," but generally may not take judicial notice of "*disputed* facts stated in public records." *Lee v. City of Los Angeles,* 250 F.3d 668, 690 (9th Cir.2001) (emphasis in original). Facts subject to judicial notice may be considered on a motion to dismiss. *Mullis v. U.S. Bankr. Ct.,* 828 F.2d 1385, 1388 (9th Cir.1987).

■ Although often conflated, the doctrine of incorporation by reference is distinct from judicial notice. "That doctrine permits a district court to consider documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the ... pleadings.'" *In re Silicon Graphics Sec. Litig.,* 183 F.3d 970, 986 (9th Cir.1999) (quoting *Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.1994)).

■ Plaintiffs' FAC references or quotes the contents of items 1, 2, and 4–10, (*see, e.g.,* FAC ¶¶ 13, 26–28, 36, 55, 56, 58, 71, 98, 107–109, 128–145, 152–156, 167–172, 180, 181, 184, 195), and Plaintiffs do not question the authenticity of these documents. Thus, the Court may *consider* their contents under the incorporation by reference doctrine even if they fail to satisfy Rule 201's requirements for *judicial notice. See Silicon Graphics,* 183 F.3d at 986. But the Court will not consider these documents for the truth of the matters they assert. *See generally Maiman v. Talbott,* 2010 U.S. Dist. LEXIS 142712 (C.D.Cal. Aug. 9, 2010).

■ Because item 3, HP's March 11 Form 10–Q, is not referenced in Plaintiff's FAC, the Court may not consider it under the incorporation by reference doctrine. Defendants argue, and Plaintiffs do not dispute, that judicial notice of this item is appropriate. *See Dreiling v. Am. Exp. Co.,* 458 F.3d 942, 947 n. 2 (9th Cir.2006) (approving judicial notice of an SEC filing). The Court therefore takes judicial notice of this item, but not for the truth of what it asserts.

■ As noted, Plaintiffs oppose Defendants' request for judicial notice and consideration of item 11, HP's March 21, 2012 Press Release. Because this document is not referenced in the FAC, the Court refuses to consider it under the incorporation by reference doctrine. Further, because Plaintiffs dispute the accuracy of this document and because it is not generally known within this Court's territorial jurisdiction or "capable of accurate and ready determination" based on sources of unquestionable accuracy, the Court refuses to judicially notice it. Fed. R.Evid. 201.

■ Plaintiffs also oppose Defendants' request for judicial notice and consideration of item 12, the August 19, 2011 Article, which reports that Bradley did not learn of HP's decision to discontinue webOS until mid-August 2011. Judicial notice of this document is inappropriate for the reasons given in the preceding paragraph. But unlike item 11, excerpts from item 12 are quoted in the FAC. (FAC ¶ 93, n.16.) Thus, the Court may consider the entire article under the incorporation by reference doctrine. *See In re Stac Electronics Sec. Litig.*, 89 F.3d 1399, 1405 n. 4 (9th Cir.1996) (approving the district court's consideration of "the *full text* of [defendant's] Prospectus, including portions which were not mentioned in the complaints") (emphasis added).

### LEGAL STANDARD

A court should dismiss a complaint when its allegations fail to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). A complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). " '[D]etailed factual allegations' are not required." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The Court must accept as true all factual allegations in the complaint and must draw all reasonable inferences from those allegations, construing the complaint in the light most favorable to the plaintiff. *Pollard v. GEO Group, Inc.*, 607 F.3d 583, 585 n. 3 (9th Cir.2010).

But the complaint must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). A court should not accept "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 663, 129 S.Ct. 1937. "[T]o be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir.2011). The complaint must also "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Id.*

Fraud claims must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which requires enough specificity to give a defendant notice of the particular misconduct to be able to defend against the charge. *Bly–Magee v. California*, 236 F.3d 1014, 1019 (9th Cir.2001) (internal citations omitted). To satisfy this specificity requirement, "the who, what,

when, where, and how" of the misconduct must be alleged. *Cooper v. Pickett,* 137 F.3d 616, 627 (9th Cir.1997). Thus, factual allegations must include "the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP,* 476 F.3d 756, 764 (9th Cir.2007).

Beyond Rules 8(a)(2) and 9(b), the Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes heightened pleading requirements. These requirements are discussed more fully in the following analysis.

*ANALYSIS*

Defendants argue that the Court should dismiss Plaintiffs' claim for violation of § 10(b) and Rule 10b–5 of the Exchange Act. The Court agrees.

■ To state a claim under § 10(b) and Rule 10b–5 of the Exchange Act, a plaintiff must allege "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *In re Daou Sys. Inc.,* 411 F.3d 1006, 1014 (9th Cir.2005) (citing *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 341–42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)). Defendants argue that Plaintiffs' § 10(b) and Rule 10b–5 claim fails because Plaintiffs do not sufficiently allege falsity or scienter. Before considering these arguments, the Court first identifies and categorizes the misstatements alleged in the FAC.

**1. ALLEGED MISSTATEMENTS**

Plaintiffs allege that Defendants made dozens of materially false and misleading statements during the proposed 9–month Class Period. Plaintiffs group these alleged misstatements—which fill nearly 40 pages of the FAC—into the following twelve categories: (1) statements made by Apotheker during HP's November 22, 2010 Earnings Call; (2) statements made by Bradley during his January 7, 2011 interview with CNBC (the "January 7, 2011 Interview"); (3) statements made by Bradley during HP's February 9, 2011 "WebOS Announcement"; (4) statements made by Apotheker and Lesjak during HP's February 22, 2011 Earnings Call; (5) statements made by Apotheker and Bradley during HP's March 14, 2011 Summit and reported in the related Summit Press Release; (6) statements made by Apotheker and Lesjak during HP's May 17, 2011 Earnings Call; (7) statements made by Apotheker in an interview with the *Wall Street Journal* during the June 1, 2011 *All Things Digital D9* Conference (the "June 1, 2011 Interview"); (8) statements made by Apotheker at the June 2, 2011 Sanford C. Bernstein & Co. Strategic Decisions Conference (the "June 2, 2011 Conference"); (9) statements made in HP's June 8, 2011 Form 10–Q signed by Lesjak; (10) statements made by Bradley and reported in a July 6, 2011 *All Things Digital* article (the "July 6, 2011 Article"); (11) statements made by Bradley in a July 11, 2011 Press Release; and (12) statements made by Bradley during a July 20, 2011 *Bloomberg News* interview (the "July 20, 2011 Interview"). (FAC ¶¶ 111–179.)

The statements made on these twelve occasions fall into two broad thematic categories: (1) statements concerning webOS PCs and printers, including *when* webOS would be placed on PCs and printers, and (2) statements concerning HP's commitment to the webOS "ecosystem," including the quality and market readiness of HP's flagship webOS product, the TouchPad tablet. The Court now describes these categories of alleged misstatements in greater detail.

**1.1 Alleged Misstatements Concerning WebOS PCs and Printers**

One of the two principal themes in Plaintiffs' 97–page, 230–paragraph FAC is

that Defendants misrepresented HP's intention to develop PCs and printers running on webOS software. Plaintiffs specifically allege that "no webOS-enabled PCs or printers existed, no such products were in development at HP, and there were no operational plans to develop such products." (FAC ¶¶ 62, 132.) But as Defendants note in their Motions, these allegations are not entirely consistent with other allegations in the FAC. For example, Plaintiffs allege that HP had a "small team in Fort Collins, Colorado that was ... exploring options regarding putting webOS on PCs." (FAC ¶ 70.) Plaintiffs also allege that "there was a very small group of HP employees (no more than 10) in San Diego who were brainstorming ways of putting webOS on printers." (FAC ¶ 72.)

In their Opposition, Plaintiffs seek to avoid this inconsistency by focusing on their "core allegation" that Defendants misrepresented *when* webOS PCs and printers would be introduced to the market, while largely ignoring their allegations that there were "*no* operational plans to develop such products." (Plaintiffs' Omnibus Opposition to Defendants' Motions ("Opp'n") at 18:24–28; FAC ¶ 62.) For example, Plaintiffs argue that "Defendants falsely led the market to believe that HP was committed to expanding [the webOS] ecosystem to include 'millions' of PCs and printers *in a specific time frame of a year*, when there were no concrete development plans (that were not merely exploratory) in existence." (Opp'n at 25:1–4 (emphasis added).) Plaintiffs further claim that, by focusing on the existence of small webOS PC and printer teams in Fort Collins and San Diego, HP "disregards the *core allegation* that Defendants misrepresented *when* webOS PCs and printers would be introduced." (Opp'n at 18:24–28 (first emphasis in original, second emphasis added).)

Plaintiffs' argument that Defendants misrepresented *when* webOS would be put on PCs and printers is based primarily on following three alleged misstatements.

(1) Bradley's statements at the February 9, 2011 "WebOS Announcement" that "I'm excited to announce our plans to bring WebOS to the HP device that has the biggest reach of all: the personal computer. So across HP, we have phenomenal people working hard to enhance our customers' already familiar experience with the PC to add a rich set of applications and services that only WebOS offers, and as we introduce that WebOS to our millions of PC customers *later this year* .... (Opp'n at 18:11–15; FAC ¶ 117 (emphasis added).)

(2) Bradley's statement at HP's March 14, 2011 Summit that "[o]ur goal with webOS and our unique opportunity is really to extend webOS to the broadest range of products available .... With this in mind, we'll be extending the ecosystem beyond phones and tablets. Development teams across HP are working to bring webOS and the webOS experience to the Windows PCs. *Next year,* we'll migrate tens of millions of web connected printers into the ecosystem .... In the figure [sic], across smart phones, TouchPads, PCs, printers, we have the potential to deliver tens if not hundreds of millions of webOS enabled devices annually into a huge installed base. (Opp'n at 18:11–15; FAC ¶ 139 (emphasis added).)

(3) Apotheker's statement at the March 14, 2011 Summit that "[t]here will be a beta version for webOS running on a browser on PCs available at the *end of the year* and you will see us putting webOS on the (inaudible) technology on PCs, on Windows PCs I should add, starting from that

point onwards. And we hope to reach 100 million devices a year." (Opp'n at 18:11–15; FAC ¶ 143 (emphasis added).)

### 1.2 Alleged Misstatements Concerning HP's Commitment to WebOS and TouchPad's Market Readiness

The second major theme in Plaintiffs' FAC is that Defendants misrepresented their commitment to the webOS ecosystem and the market readiness of the TouchPad tablet. (FAC ¶¶ 77–95.) For example, Plaintiffs reference Apotheker's statements that "webOS is ready for prime time" and that HP would not release a TouchPad that "isn't perfect" more than 20 times in the FAC. (FAC ¶¶ 77, 106, 158.)

But like the first category of alleged misstatements, Plaintiffs's modify this second theme in their Opposition. The Opposition downplays Defendants' alleged misstatements regarding defects in the TouchPad, and instead focuses primarily on Defendants' misrepresentations concerning HP's commitment to the webOS ecosystem. Indeed, Plaintiffs fault Defendants for focusing too heavily on TouchPad-related allegations, claiming that "Defendants ignore that the Complaint's allegations *center on the webOS 'ecosystem' as a whole*, not the TouchPad in isolation." (Opp'n at 3:9–10 (emphasis added).) Plaintiffs further state that

> The Complaint plainly alleges that Defendants misled the market by making statements that HP was committed to developing an 'ecosystem' of products, all based on webOS, that would connect seamlessly with each other. The Complaint does not allege, as Defendants assert, that HP was not committed to developing the TouchPad *in isolation.*

(Opp'n at 24:11–14 (emphasis in original).)

Plaintiffs' argument that Defendants misrepresented their commitment to we-bOS is partially derivative of Plaintiffs' arguments concerning webOS PCs and printers. For example, Plaintiffs contend that Defendants "falsely led the market to believe that HP was committed to expanding the ecosystem to include 'millions' of PCs and printers." (Opp'n at 25:1–5.) But this argument is also based on numerous additional alleged misstatements made (1) during the February 9, 2011 WebOS Announcement; (2) during the February 22, 2011 Earnings Call; (3) at the March 14, 2011 Summit; (4) during the May 17, 2011 Earnings Call; (5) during the June 1, 2011 Interview; (6) at the June 2, 2011 Conference; (7) in the June 8, 2011 Form 10–Q; (8) in the July 6, 2011 Article; (9) in the July 11, 2011 Press Release; and (10) during the July 20, 2011 Interview.

Having identified and categorized the numerous misstatements alleged in the FAC, the Court must consider whether any of them were knowingly false when made. But before addressing the issues of falsity and scienter, the Court must first determine whether any of the alleged misstatements are protected by the PSLRA's safe-harbor or constitute non-actionable puffery.

### 2. THE PSLRA SAFE HARBOR

The PSLRA "provides a safe harbor for: [1] identified forward-looking statements with sufficient cautionary language; [2] immaterial statements; and [3] unidentified forward-looking statements ... lacking sufficient cautionary language where the plaintiff fails to prove actual knowledge that the statement was false or misleading." *In re Cutera Sec. Litig.,* 610 F.3d 1103, 1113 (9th Cir.2010) (citing 15 U.S.C. § 78u–5(c)(1)). When forward-looking statements are accompanied by meaningful cautionary language, a "defendant's state of mind is irrelevant." *In re Cutera,* 610 F.3d at 1112–1113 (quoting

*Harris v. Ivax Corp.,* 182 F.3d 799, 803 (11th Cir.1999)).

▮ Defendants argue that many of their alleged misstatements are protected by the PSLRA's safe harbor, including all statements made (1) during the February 22, 2011 Earnings Call (FAC ¶¶ 128–134); (2) during the March 14, 2011 Summit (FAC ¶¶ 135–149); (3) during the May 17, 2011 Earnings Call (FAC ¶¶ 152–156); and (4) in HP's June 8, 2011 Form 10–Q. (FAC ¶¶ 167–170.) Plaintiffs do not dispute that the statements made during the February 22, 2011 Earnings Call or in the June 8, 2011 Form 10–Q are protected by the PSLRA's safe harbor. Instead, Plaintiffs argue only that Defendants' March 14, 2011 and May 17, 2011 statements are not entitled to such protection. (Opp'n at 13:5–16:23.)

Plaintiffs first contend that Defendants' March 14, 2011 and May 17, 2011 statements are not protected by the safe harbor because they "were not identified as forward-looking." (Opp'n at 13:5–8 (citing 15 U.S.C. § 78u–5(c)(1)(A).) This argument fails primarily because Plaintiffs acknowledge that Defendants advised attendees of the March 14, 2011 Summit that Defendants' statements might include "forward looking information that involved risk, uncertainties and assumptions." (Reply at 43:10–11.) Summit attendees were also directed to HP's March 11, 2011 Form 10–Q for a more detailed description of relevant risks. (*Id.*)

▮ Likewise, listeners on the May 17, 2011 Earnings Call were informed that "some information provided during this call may include forward-looking statements that are based on certain assumptions and are subject to a number of risks and uncertainties, and actual future results may differ materially." (Opp'n at 13:20–22; Defendants' Omnibus Reply to Opp'n ("Reply") at 43:14–16.) These cautionary statements were sufficient to notify listeners of the forward-looking nature of Defendants' March 14, 2011 and May 17, 2011 statements.

Plaintiffs next argue that Defendants' March 14, 2011 and May 17, 2011 statements are not protected by the safe harbor because Defendants' disclaimers were too "boilerplate" and "generic" to qualify as "meaningful" under the PSLRA. *See* 15 U.S.C. § 78u–5(c)(1)(A) (requiring forward-looking statements be "accompanied by *meaningful* cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements") (emphasis added). (Opp'n at 13:19, 20:7.) But Plaintiffs cite no statute or case law to support their argument that the identification of forward looking statements requires greater specificity than Defendants provided. And courts in this Circuit have found cautionary statements similar to Defendants' March 14, 2011 and May 17, 2011 statements to be sufficient to qualify for the safe harbor. In *Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co.,* for example, the Ninth Circuit held that the following statement, given at the outset of a conference call was sufficiently meaningful.

> Now before I begin, I need to remind you that any forward-looking statements made on this call represent our best judgment as to what may occur in the future. The Company's actual results will depend on a number of competitive and economic factors some of which may be outside the control of the Company. We refer you to our Form 10K filing . . . for a discussion of the most important of these factors.

353 F.3d 1125, 1132–1133 (9th Cir.2004) (rejecting plaintiff's argument that "the content of the Form 10K filing . . . [referred to] at the beginning of the conference call should not have been considered

[by the court] because only cautionary statements actually accompanying the false statements can be considered as a defense").

Plaintiffs also argue that "the cautionary language that accompanied Defendants' May 17, 2011 statements was not 'meaningful' because it did not 'relate directly to the forward-looking statements at issue.'" (Opp'n at 16:4–6 (quoting *In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at *10 (C.D.Cal. June 17, 2011).) Plaintiffs specifically claim that the cautionary language was insufficiently tethered to statements concerning HP's plans to build the webOS ecosystem and expand webOS to PCs and printers.

The cautionary statements accompanying the May 17, 2011 Earnings Conference Call warned listeners of "quality and other defects [that] may not be supported adequately by application software," and referred to the possibility of "defects in ... engineering, design and manufacturing." While these statements do not expressly refer to webOS, the cautionary language concerning software quality and engineering defects was sufficient to satisfy the safe harbor's threshold requirements. *See In re Nuvelo, Inc., Sec. Litig.*, 2008 WL 5114325, at *16 (N.D.Cal. Dec. 4, 2008) (holding that "the law does not require specification of the particular factor that ultimately renders the forward-looking statement incorrect").

Finally, Plaintiffs argue that the cautionary statements were not "meaningful" because Defendants' statements were knowingly false. (Opp'n at 15:13–16:3.) This argument fails because it conflates separate docks in the PSLRA's safe harbor. As noted, the PSLRA "provides a safe harbor for: (A)(I) identified forward-looking statements with sufficient cautionary language; (A)(ii) immaterial statements; *and* (B)(I)-(ii) unidentified forward-looking statements ... lacking sufficient caution-

ary language where the plaintiff fails to prove actual knowledge that the statement was false or misleading." *In re Cutera*, 610 F.3d at 1112–1113 (emphasis added). "[F]or forward-looking statements that are accompanied by meaningful cautionary language," like those Defendants made on March 14, 2011 and May 17, 2011, "subsection (A)(I) makes the [defendant's] state of mind irrelevant." *Id.* The Court therefore rejects Plaintiffs' argument that the cautionary language was not meaningful *because* Defendants allegedly knew that the forward-looking statements were false when made.

Defendants alleged misstatements (1) during the February 22, 2011 Earnings Call, (2) during the March 14, 2011 Summit, (3) during the May 17, 2011 Earnings Call, and (4) in the June 8, 2011 Form 10–Q are forward-looking and accompanied by meaningful cautionary language. *See* 15 U.S.C. 78u–5(c)(1)(A); *see also In re Cutera*, 610 F.3d at 1113. Accordingly, these statements are protected by the PSLRA's safe harbor and cannot be used to establish Defendants' liability under § 10(b) or Rule 10b–5 of the Exchange Act.

## 3. PUFFERY

Defendants next argue that many of their alleged misstatements cannot support Plaintiffs' securities fraud claims because they constitute "immaterial, inactionable puffery." (Motion at 8:9.) "[V]ague, generalized assertions of corporate optimism or statements of 'mere puffing' are not actionable material misrepresentations under federal securities laws." *In re Impac Mortg. Holdings, Inc., Sec. Litig.*, 554 F.Supp.2d 1083, 1096 (C.D.Cal. 2008) (citing *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003) (finding no liability under federal securities laws where the alleged misstatements "were generalized, vague and un-

specific assertions, constituting mere puffery upon which a reasonable consumer could not rely") (internal citations omitted)).

 The "defining question is ... whether the statement is so 'exaggerated' or 'vague' that no reasonable investor would rely on it when considering the total mix of available information." *In re Impac*, 554 F.Supp.2d at 1096 (quoting *In re Splash Tech. Holdings, Inc., Sec. Litig.*, 160 F.Supp.2d 1059, 1076 (N.D.Cal.2001)). Generally, "forward-looking or generalized statements of optimism that are 'not capable of objective verification' " constitute inactionable puffery. *In re Cornerstone Propane Partners*, 355 F.Supp.2d 1069, 1087–88 (N.D.Cal.2005) (quoting *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir.1997)).

Defendants argue that their alleged misstatements concerning both webOS PCs and printers and their commitment to webOS are mere puffery. The Court addresses both categories of statements in turn.

### 3.1 Whether Defendants' Alleged Misstatements Concerning WebOS PCs and Printers Constitute Inactionable Puffery

 Defendants briefly argue that their alleged misstatements concerning the *timing* of the placement of webOS on PCs and printers constitute inactionable puffery because "[n]o reasonable investor would have viewed general aspirational statements about the timing for putting webOS on PCs and printers as definite promises." (Reply at 21:10–12.) The Court disagrees.

Defendants' statements concerning the timing of putting webOS on PCs and printers are distinguishable from the "vague statements of optimism" typically classified as "mere puffing." *Tektronix*, 352 F.3d at 379; *cf. In re Cutera*, 610 F.3d at 1111 (finding the statements "we believe our employee relations are good," "we're doing well and I think we have a great future," "business will be good this year," and "we expect the second half of fiscal 1992 to be stronger than the first half" to constitute "non-actionable puffing"). Unlike the insubstantial comments identified in *In re Cutera*, a reasonable investor could have relied on Defendants' predictions regarding HP's timeline for developing webOS PCs and printers. Accordingly, the Court declines to classify as mere puffery Defendants' alleged misstatements concerning the timing for putting webOS on PCs and printers.

### 3.2 Whether Defendants' Alleged Misstatements Concerning HP's Commitment to WebOS Constitute Inactionable Puffery

 Whether Defendants' alleged misstatements concerning HP's commitment to webOS constitute puffery is a more difficult question. Plaintiffs appear to concede that many of Defendants' alleged misstatements, at least *standing alone*, would constitute inactionable puffery. (Opp'n at 6:3–21.) But Plaintiffs argue that these otherwise innocuous statements are nevertheless actionable because they were "used to emphasize and induce reliance" on Defendants' alleged misrepresentations. (Opp'n at 6:7–14 (citing *Beloit Corp. v. Emett & Chandler Cos.*, 1991 WL 153459, at *3 (9th Cir. Aug. 14, 1991)).) Plaintiffs further claim that such statements are actionable because they "immediately preceded or followed ... very specific statements of fact that supposedly justif[ied] or suppl[ied] a foundation for the optimism." (Opp'n at 6:22–24 (quoting *South Ferry LP # 2 v. Killinger*, 399 F.Supp.2d 1121, 1130 (W.D.Wash.2005), *vacated in part on other grounds*, 542 F.3d 776 (9th Cir.2008)).)

Defendants attack Plaintiffs' first argument by contending that reliance on the Ninth Circuit's unpublished, pre-PSLRA decision in *Beloit* is improper. While the Court agrees that Plaintiffs may not rely on *Beloit* itself—*see* Ninth Circuit Rule of Appellate Procedure 36–3 ("[u]npublished dispositions and orders of this Court issued before January 1, 2007 may not be cited to the courts of this circuit" except in limited circumstances not applicable here)—the language from *Beloit* quoted in Plaintiffs' Opposition also appears in at least one *published* Ninth Circuit decision. *See Casella v. Webb*, 883 F.2d 805, 808 (9th Cir.1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation.") Thus, to the extent *Casella* is consistent with post-PSLRA Ninth Circuit case law, the Court must consider whether Defendants' "puffing" comments were "used to emphasize and induce reliance" on other alleged misrepresentations. *Id.*

Defendants attack Plaintiffs' second argument by attempting to distinguish *South Ferry* on its facts, adding needless complexity to the puffery analysis. *South Ferry* stands for the unremarkable proposition that defendants can't take statements out of context when arguing that they constitute puffery. *South Ferry*, 399 F.Supp.2d at 1130. The defendants in *South Ferry* argued that the following statement constituted puffery: "Our past systems integration experience in acquisition will be put to good use as we tackle the complexities of this challenge." *Id.* While noting that "[t]his sentence, standing alone or in a different context, *could* constitute puffery," the *South Ferry* court held that the statement could *not* be considered puffery when read alongside the sentence *immediately following it.* *Id.* (emphasis in original).

Here, Plaintiffs argue that Defendants' statements concerning the webOS ecosystem, even if inactionable standing alone, become actionable when considered alongside other statements demonstrating Defendants' commitment to webOS. (Opp'n at 7:12–8:8.) Plaintiffs specifically contend that statements concerning HP's commitment to webOS are actionable because they "were made in conjunction with factual statements such as the following":

"as you've seen, we're extending the [w]ebOS family ... [w]e're adding two new smartphones, the first ever webOS Touchpad," [FAC ¶ 117]; "we announced the TouchPad and two new smartphones—the Pre3 and the Veer," [FAC ¶ 130]; "the family of products that we announced last month, the Veer, the [pre3] Smartphone, the HP TouchPad, each offer the same great webOS experience ubiquitously across the device," [FAC ¶ 139] and "[t]he devices we have been able to put on display on February 9[, 2011] have in themselves a certain set of characteristics that make them unique. There is interconnectivity, the fact that they are seamless, they connect seamlessly to each other," [FAC ¶ 143].

(Opp'n at 7:15–8:8.)

As explained in Section 2, the alleged misstatements in paragraphs 130, 139, and 143 of the FAC—made during the February 22, 2011 Conference Call and the March 14, 2011 Summit—are not actionable because they are protected by the PSLRA's safe harbor. Thus, the Court need not address whether any statements in these paragraphs concerning HP's commitment to webOS render actionable statements that would normally be considered puffery.

The alleged misstatements in paragraph 117, by contrast, are not protected by the safe harbor. That paragraph contains two

and a half pages of alleged misstatements concerning HP's commitment to webOS made by Bradley during the February 9, 2011 WebOS Announcement. (FAC ¶ 117.) Many of these statements arguably constitute puffery, including the following: (1) "right now, we're applying the full force, the full capability of our innovation and our scale to a set of products that are the building blocks in a long term strategy"; (2) "we have a commitment to extend the webOS footprint even further as the year progresses"; (3) "our commitment is to extend the webOS experience across the broadest range of devices for our customers"; and (4) "I want to emphasize ... the commitment HP is making to develop the full potential of webOS in the marketplace." (FAC ¶ 117.)

Although these statements, standing alone, might constitute puffery, they cannot be dismissed as "generalized, vague and unspecific assertions" when read in the context of Bradley's February 9, 2011 statements *as a whole.* For example, Bradley elaborates on HP's commitment to webOS, explaining that "we're adding two new smartphones [and] the first ever webOS TouchPad." (FAC ¶ 17.) He also states that HP plans to "tak[e] webOS to other connected devices, including printers" and to "introduce ... webOS to our millions of PC customers later this year." (FAC ¶ 117.) The detail included in these statements precludes a finding that Bradley's February 9, 2011 remarks constitute mere puffery.

 The analysis of Apotheker's June 2011 statements is simpler. Some of Apotheker's statements concerning HP's commitment to webOS in the June 1, 2011 Interview and at the June 2, 2011 Conference are not puffery. (*See, e.g.,* FAC ¶ 157 ("[w]e'll put webOS on PCs. It will go on every PC that we'll ship. . . . It will also be on every printer we ship above $100. . . . Add printers and PC and TouchPad, we're

talking 100 to 110 million devices a year"); FAC ¶ 161 ("I am happy to reconfirm that webOS will be available on PCs, on top of Windows").) These statements, which highlight HP's plans to expand webOS to millions of PCs and printers, are too specific to be dismissed as puffery. Other statements made by Apotheker at the June 1, 2011 Interview and the June 2, 2011 Conference are puffery, including the following two statements: (1) "[t]he one lesson I have learned from this, and I'm driving my engineers crazy with this, is that we will not release a [TouchPad] product that isn't perfect," and (2) "webOS is ready for prime time." (FAC ¶¶ 106, 158, 161.)

 Plaintiffs argue that these latter two statements do not constitute puffery because "Defendants knew, at the time those statements were made, of significant problems in readying their webOS products for the market." (Opp'n at 11:15–19.) This scienter-based argument is wrong. Whether a statement constitutes "mere puffing" has nothing to do with the maker's state of mind. Rather, a statement constitutes inactionable puffery—even if the maker was aware of its falsity—if the statement is so "generalized, vague and unspecific" that no reasonable consumer could rely on it. *See Tektronix,* 352 F.3d at 379. Apotheker's statements about "perfect[ing]" the TouchPad and readying it for "prime time" are quintessential examples of puffery. *See In re Splash Tech. Holdings,* 160 F.Supp.2d at 1076 (holding that the "defining question is ... whether the statement is so 'exaggerated' or 'vague' that no reasonable investor would rely on it when considering the total mix of available information"); *cf. In re Apple Computer, Inc. Sec. Litig.,* 243 F.Supp.2d 1012, 1018 (N.D.Cal.2002), *aff'd,* 127 Fed.Appx. 296 (9th Cir.2005) (finding the statements

"drop dead," "incredibly functional," and the "whole thing is perfect" to be puffery).

While *some* of Apotheker's June 2011 statements are actionable, the same cannot be said for Bradley's statements reported in the July 6, 2011 Article. Although the article's author states that "HP is counting on webOS to power a range of devices ... and boost [webOS's] presence by making it available on printers [and] ... Windows PCs," the only statement expressly attributed to Bradley is that "[w]e've got lots of capabilities that we have to bring to scale. We've just got to do it." (FAC ¶ 171.) This latter statement constitutes inactionable puffery.

The statements in HP's July 11, 2011 Press Release are also puffery. (*See, e.g.,* FAC ¶¶ 173, 174 (HP "underscores [its] strategy to provide a seamless, secure, context-aware experience across [its] product portfolio and to deliver innovation at unmatched scale" and will "draw[ ] on [its] deep executive bench to position the right leaders in the right roles to accelerate the long-term growth of webOS").) Tellingly, Plaintiffs do not directly address the contents of July 6, 2011 Article or the July 11, 2011 Press Release in their Opposition.

Finally, the Court finds that some of Bradley's statements concerning HP's commitment to webOS in the July 20, 2011 Interview do not constitute puffery. While Bradley's remark that "we're very happy with the [TouchPad] ramp [and] we'll continue to invest very aggressively," qualifies as puffery, his reiteration of HP's "intention to enable all of our *PC* users to access their webOS environment" is not inactionable as a matter of law. (FAC ¶ 178 (emphasis added).)

### 3.3 Conclusion

Bradley's statements reported in the July 6, 2011 Article and HP's statements in the July 11, 2011 Press Release consti-

tute inactionable puffery, as do *some* of Apotheker's June 2011 remarks and *some* of Bradley's July 2011 comments. Thus, of the misstatements alleged in the FAC and unprotected by the PSLRA's safe harbor, only the following are potentially actionable: (1) Bradley's February 9, 2011 statements, and (2) some of Apotheker and Bradley's June and July 2011 statements.

### 4. FALSITY

Defendants argue that Plaintiffs fail to adequately allege that Defendants' statements were false when made. "The PSLRA has exacting requirements for pleading 'falsity.'" *Metzler Inv., GMBH v. Corinthian Colleges, Inc.,* 540 F.3d 1049, 1070 (9th Cir.2008). A complaint must "specify *each* statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* (quoting 15 U.S.C. § 78u–4(b)(1)).

"The stricter standard for pleading scienter [under the PSLRA] naturally results in a stricter standard for pleading falsity, because falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts." *Daou,* 411 F.3d at 1015 (9th Cir.2005) (internal citations omitted). "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet this standard." *Metzler,* 540 F.3d at 1070; *see also Falkowski v. Imation Corp.,* 309 F.3d 1123, 1133 (9th Cir.2002) ("Although the allegations here are voluminous, they do not rise to the level of specificity required under the PSLRA.").

Because many of Plaintiffs' allegations come from accounts of confidential wit-

nesses, their "use in satisfying the PSLRA's standard of particularity must be addressed" before the Court turns to parties' arguments concerning falsity. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015–16 (9th Cir.2005).

### 4.1 Confidential Witnesses

 Confidential witnesses "relied upon in a complaint should be described … with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Daou*, 411 F.3d at 1015–16. To determine whether a confidential witness is sufficiently reliable, courts look to "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir.2009) (internal citations omitted); *see also Daou*, 411 F.3d at 1016 (holding that plaintiffs "sufficiently met the PSLRA's requirements for confidential witnesses" by (1) "describing [their] job description and responsibilities"; (2) "provid[ing] the witnesses' exact title"; and (3) identifying "to which … executive the witness reported," among other things). Defendants argue that *none* of Plaintiffs' four confidential witnesses have been "described with sufficient particularity to establish their reliability and personal knowledge." (Motion at 18:11–14.) The Court disagrees.

 The FAC alleges that Confidential Witness 1 ("CW1") was Vice President of Software Engineering in HP's Palm Global Business Unit ("GBU") in Sunnydale, California from October 2011 through July 2011, where he "led the team developing the webOS software platform for the TouchPad, specifically an updated version

of webOS, codenamed 'Dartfish,' that was released on the TouchPad as webOS 3.0." (FAC ¶ 63.) CW1 reported to a Senior Vice President in the Palm GBU, who in turn reported to Jon Rubinstein, the former CEO of Palm, who served as Senior Vice President and General Manager of the Palm GBU during the proposed Class Period. (FAC ¶¶ 45, 63, 92.) Rubinstein reported directly to Bradley. (FAC ¶ 63.) This level of detail is sufficient to satisfy *Daou's* reliability requirements for confidential witnesses.

 The FAC alleges that Confidential Witness 2 ("CW2") was an HP employee from 2000 to December 2011, first as Vice President of Marketing and Strategy in the Solution Partners Organization of PSG, and beginning in June 2011, as Senior Vice President of Enterprise Business Development. (FAC ¶ 73.) The FAC further alleges that CW2 was tasked to "develop webOS and adapt the TouchPad for the commercial market" and that he or she handled phone calls from corporate clients desiring information about HP's webOS plans. (FAC ¶ 75.) These allegations are also sufficient to satisfy the minimum standards of reliability and personal knowledge set forth in *Daou*.

 The FAC alleges that Confidential Witness 3 ("CW3") was the Senior Vice President of Hardware Engineering in the Palm GBU from July 2010 to November 2011. (FAC ¶ 82.) Plaintiffs specifically allege that CW3 was responsible for webOS hardware and reported to Rubinstein. (*Id.*) This description, combined with the "corroborative nature" of CW3's statements, provides sufficient indicia of CW3's reliability. *Zucco*, 552 F.3d at 995.

 The same cannot be said for Confidential Witness 4 ("CW4"). The FAC alleges that he or she was a Director and then a Senior Director of webOS in the

Palm GBU from July 2010 until November 2011. But instead of identifying CW4's supervisor, Plaintiffs allege only that CW4 reported to CW1 and another unnamed manager. And while Plaintiffs describe the duties of CW4's *team,* they do not describe CW4's specific responsibilities. Because there is insufficient indicia of CW4's reliability, the Court disregards his or her statements.

The Court's determination that the descriptions of CW1, CW2, and CW3 satisfy *Daou's* minimum reliability standards doesn't mean that *every* statement offered by these witnesses must be accepted as true. In certain circumstances, the Court may disregard confidential witness statements that are speculative, lack specificity, or are not based on personal knowledge. *See, e.g., Wozniak v. Align Tech., Inc.,* 850 F.Supp.2d 1029, 1037–38 (N.D.Cal.2012) (finding that speculative statements from confidential witnesses were insufficient to establish scienter). Further, while reliance on hearsay does not automatically render confidential witness statements unreliable, such reliance may indicate that particular statements are "not sufficiently reliable, plausible, or coherent to warrant ... consideration." *Zucco,* 552 F.3d at 998. And of course, "those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of [falsity] or scienter." The Court discusses specific statements from the confidential witnesses more fully in the following falsity and scienter analyses.

**4.2 Whether Plaintiffs Adequately Allege that Bradley's February 9, 2011 Statements Were False When Made**

As noted in Section 1.1, on February 9, 2011, Bradley stated that

across HP, we have phenomenal people working hard to enhance our customers' already familiar experience with the PC to add a rich set of applications and services that only WebOS offers, and as we introduce that WebOS to our millions of PC customers *later this year,* we'll clearly expand the reach for our developers as well, and we'll expand it exponentially.

(FAC ¶ 117 (emphasis added).) Plaintiffs argue that this statement was false when made because there were no plans to put webOS on PCs and printers before the end of 2011. To support this argument Plaintiffs rely primarily on allegations from CW1 and CW2 and an internal HP "webOS roadmap" document.

According to CW1, Bradley "made public pronouncements [in February 2011] that HP would put webOS on PCs and printers when that had not been discussed internally and when there were no plans to do so." (FAC ¶ 64.) The FAC also alleges that "CW1 recalled thinking how Bradley could possibly make [his February 9, 2011] assertion when, internally, the Company did not know if or when it would be able to put webOS on PCs." (FAC ¶ 66.) But while *CW1* may have been unaware of internal discussions regarding webOS PCs and printers, the FAC does not sufficiently allege that such discussions never occurred. And CW1's conclusory statement that he or she "would have had to be involved in such a plan [to put webOS on PCs and printers]," is contradicted by allegations that teams in Fort Collins and San Diego were planning the development of webOS PCs and printers, *without* the involvement of CW1 or CW1's team. (FAC ¶¶ 70, 72.)

Plaintiffs' falsity argument also fails because the FAC doesn't adequately allege that webOS PCs and printers could not have been completed by the end 2011.

CW1 states, for example, that in February 2011, webOS was "simply a concept that was 'worlds away' from developing a product that eventually could be sold." (FAC ¶ 70.) But in the very next sentence, CW1 states that "it *generally* takes at least a year from concept to delivery." (*Id.* (emphasis added).) Plaintiffs fail to adequately allege that this one-year rule of thumb applied to HP's webOS initiative, or that it would not have been possible to deliver webOS PCs and printers in 46 weeks—that is, the time between Bradley's February 9, 2011 statements and the end of 2011.

Allegations attributable to CW2 are also inadequate to establish the falsity of Bradley's February 9, 2011 statements. CW2 alleges that "when Bradley first announced HP's plans to extend webOS to PCs in the January 2011 CNBC interview, there were no such development efforts or plans within HP." (FAC ¶ 75.) But at the same time, Plaintiffs allege that there *were* preliminary development efforts ongoing in Fort Collins and San Diego. Notably absent from Plaintiffs' FAC is any allegation that such efforts began *after* January 2011. The remaining allegations attributable to CW2—which consist mainly of hearsay statements from employees (some unnamed)—primarily concern Defendants' statements in June and July 2011, and cannot therefore be used to establish the falsity of Bradley's *February* 2011 statement. (*See, e.g.,* FAC ¶ 76.)

Finally, Plaintiffs allege that an internal "webOS Roadmap" document establishes the falsity of Bradley's February 9, 2011 statements concerning webOS PCs and printers. (FAC ¶ 68.) The roadmap provides the names and release dates for four webOS devices: (1) the Veer smartphone in June 2011; (2) the TouchPad 16/32 GB in July 2011; (3) the TouchPad 64GB & 4G in August 2011; (4) and the Pre3 and OPAL smartphones in "fall 2011." (*Id.*)

Significantly, the fifth element of the roadmap contains a graphic that says "more to come" *with no corresponding date.* (*Id.*) Thus, allegations based on the roadmap, which was created in "late spring 2011," (FAC ¶ 69), are insufficient to show that HP lacked plans to release webOS PCs and printers in the final months of 2011.

Plaintiffs' argument that Bradley's February 9, 2011 statements misrepresented HP's commitment to webOS are undermined by numerous allegations regarding Defendants' efforts to develop webOS devices from February to August 2011.

The Court finds that Plaintiffs do not sufficiently allege the falsity of Bradley's February 9, 2011 statements.

### 4.3 Whether Plaintiffs Adequately Allege that Bradley and Apotheker's "Late Class Period" Statements Concerning HP's Commitment to WebOS Were False When Made

As noted in Section 1.2, the FAC alleges that Defendants misrepresented their commitment to the webOS ecosystem *and* the TouchPad's market readiness. These latter allegations contradict the former. For example, CW2 alleges that, in May 2011

> after senior management realized that the Palm GBU would have difficulty meeting milestones that had been set for the TouchPad webOS consumer platform, senior management decided to begin developing the commercial application of the TouchPad as a way of offsetting the expected revenue losses on the TouchPad's consumer sales.

(FAC ¶ 87.) CW2 also alleges that "HP rushed to meet the July 1[, 2011] release date [of the TouchPad] in order to attempt to compete with [Apple's] iPad 2." (FAC ¶ 81.)

Far from establishing Defendants' *lack* of commitment to webOS, Plaintiff's allegations concerning Defendants' imperfect efforts to bring the TouchPad to market show that Defendants *were* committed to webOS, at least as late as July 1, 2011. Indeed, Plaintiffs include in their FAC an internal email, dated July 1, 2011, touting the "start of a new era for HP as our vision for connected mobility begins to take form—an ecosystem of services, applications and devices connected seamlessly by webOS." (FAC ¶ 88.) This email is consistent with Bradley's July 2011 statement reiterating HP's "commit[ment] to a broad webOS lineup." (FAC ¶ 91.) Similarly, the FAC's reference to an internal August 1, 2011 email concerning Defendants' efforts to correct flaws in the TouchPad contradict Plaintiffs' allegations that Bradley's July 20, 2011 comments affirming HP's commitment to webOS were false when made. (*See* FAC ¶ 95.)

Plaintiffs' allegations concerning defects in the TouchPad are also inadequate to establish falsity. While allegations regarding technical "bugs" in the webOS software and HP's issuance of software "improvements" are sufficient to establish that the TouchPad contained flaws, (*see* FAC ¶¶ 83–95), Plaintiffs fail to adequately allege that a reasonable investor would have relied on Apotheker's puffing promises of "perfection." *See Tektronix,* 352 F.3d at 379 (finding no liability under federal securities laws where the alleged misstatements "were generalized, vague and unspecific assertions, constituting mere 'puffery' upon which a reasonable consumer could not rely"); *see also In re Siebel Sys., Inc. Sec. Litig.,* 2005 WL 3555718, at *4 (N.D.Cal. Dec. 28, 2005) ("That a new program has kinks does not make a positive statement about the program false. If that were the case, the federal securities laws would prevent software companies from making any positive statements about new software.")

Plaintiffs fail to adequately allege that Defendants' "late-class period" statements concerning HP's commitment to webOS were false when made.

## 4.4 Conclusion

The Court finds that Plaintiffs fail to adequately allege the falsity of Bradley's February 9, 2011 statements and Defendants' late-class period statements. Plaintiffs allegations concerning the falsity of Defendants' other alleged misstatements cannot support a claim for violations of federal securities laws because those statements are protected by the PSLRA's safe harbor, constitute inactionable puffery, or both. Thus, Plaintiffs fail to state a claim under § 10(b) or Rule 10b–5 of the Exchange Act.

## 5. SCIENTER

Under the PSLRA, a securities fraud complaint "must raise a 'strong inference' of scienter—i.e., a strong inference that the defendant acted with an intent to deceive, manipulate, or defraud." *Metzler,* 540 F.3d at 1061 (quoting 15 U.S.C. § 78u–4(b)(2)); *see also Matrixx Initiatives, Inc. v. Siracusano,* —— U.S. ——, 131 S.Ct. 1309, 1324, 179 L.Ed.2d 398 (2011) (To plead scienter under the PSLRA, "a plaintiff must 'state *with particularity* facts giving rise to a *strong inference* that the defendant acted with the required state of mind.'") (quoting 15 U.S.C. § 78u–4(b)(2)(A)) (emphasis added).

"[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, 'the court must take into account plausible opposing inferences,' including inferences unfavorable to the plaintiffs." *Metzler,* 540 F.3d at 1061 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 310, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)). "A complaint adequately pleads scienter under the PSLRA 'only if a

reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Matrixx*, 131 S.Ct. at 1324 (citations omitted). But "[t]he inferences that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324, 127 S.Ct. 2499 (citations omitted).

In pleading scienter, a securities fraud plaintiff "must 'allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness.'" *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1180 (9th Cir. 2009), *aff'd sub nom. Matrixx Initiatives, Inc. v. Siracusano*, — U.S. —, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011) (quoting *Zucco*, 552 F.3d at 991; *see also Matrixx*, 131 S.Ct. at 1312–13 ("This Court assumes, without deciding, that the scienter requirement may be satisfied by a showing of deliberate recklessness."). Reckless conduct satisfies the scienter standard "to the extent it reflects some degree of intentional or conscious misconduct." *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir.2008) (quoting *Silicon Graphics*, 183 F.3d at 977). In the scienter context, the Ninth Circuit defines recklessness as

> a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Siracusano*, 585 F.3d at 1180 (quoting *Silicon Graphics*, 183 F.3d at 976).

■ On a motion to dismiss, courts "must first 'determine whether any of the plaintiff's allegations, standing alone, are

sufficient to create a strong inference of scienter.'" *Siracusano*, 585 F.3d at 1180 (quoting *Zucco*, 552 F.3d at 992). If they do not, the court then conducts a holistic review of the complaint's allegations "to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id.* (quoting *Zucco*, 552 F.3d at 992); *accord Matrixx*, 131 S.Ct. at 1324 ("In making this determination, the court must review 'all the allegations holistically.'") (quoting *Tellabs*, 551 U.S. at 326, 127 S.Ct. 2499).

Plaintiffs' allegations that Defendants' misstatements were intentional or deliberately reckless are based on (1) the "temporal proximity" between the alleged misstatements and HP's "complete abandonment" of webOS; (2) the magnitude of HP's webOS write-downs; (3) Defendants' knowledge of "problems involving core operations"; and (4) Apotheker's termination one month after HP's decision to discontinue operations for webOS devices. (*See generally* Opp'n at 39:19–45:17.) The Court considers whether any of these allegations, standing alone, are sufficient to create a strong inference of scienter before examining them holistically.

**5.1 Whether Plaintiffs' Allegations Concerning the Temporal Proximity of Defendants' Alleged Misstatements to the Discontinuation of WebOS Are Sufficient to Establish Scienter**

■ Plaintiffs first argue that "the temporal proximity between Defendants' late-class period misstatements and their complete abandonment of webOS supports a strong inference of *scienter*." (Opp'n at 39:19–22 (emphasis added).) Plaintiffs' temporal proximity argument expressly applies only to Defendants' "late-class pe-

riod misstatements." (Opp'n at 39:19–22.) Thus, temporal proximity cannot be used to establish scienter concerning Bradley's February 9, 2011 comments. As for Defendants' June and July statements, while temporal proximity can "bolster" the inference that a misstatement was intentional, *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 n. 5 (9th Cir.2008), mere proximity is insufficient to establish that Defendants knowingly lied. *See Ronconi v. Larkin*, 253 F.3d 423, 437 (9th Cir.2001). In any event, Plaintiffs' allegations that Defendants' knowingly lied about HP's commitment to webOS are undermined by their inconsistent allegations concerning HP's July and August 2011 efforts to improve flaws in certain webOS devices. (*See, e.g.* FAC ¶ 95.)

Plaintiffs' allegations concerning late-class period misstatements, standing alone, are inadequate to establish scienter.

### 5.2 Whether Plaintiffs' Allegations Concerning the Magnitude of HP's Write–Downs Are Sufficient to Establish Scienter

■ Plaintiffs next argue that "the magnitude of [HP's webOS-related] write-downs, *viewed collectively* with Plaintiffs' other allegations, supports a strong inference of scienter." (Opp'n at 41:9–20, 42:1–13 (emphasis added).) This argument implicitly concedes that, standing alone, HP's 2011 write-downs are insufficient to establish Defendants' scienter. And the cases Plaintiffs cite do not convince the Court otherwise. Indeed, the write-downs in these cases played a uniformly minor role in the scienter analysis. (*See* Opp'n at 41:9–20, 42:1–13 (citing *In re Terayon Comm. Sys.*, 2002 WL 989480 (N.D.Cal. Mar. 29, 2002) (finding that a 94% write-down in intangible assets was sufficient to establish scienter when combined with insider trading that "could hardly be more suspicious"); *Freudenberg v. E\*Trade Fin.*, 712 F.Supp.2d 171, 200 (S.D.N.Y.

2010) (holding that a large write off combined with insider stock sales, among other things, was sufficient to establish scienter)).) If *intentional* misconduct could be inferred solely from declines in share prices or business losses, the PSLRA's heightened pleading requirements for scienter would be rendered meaningless. *See Matrixx*, 131 S.Ct. at 1324

Plaintiffs' allegations concerning the magnitude of HP's write-downs, standing alone, are insufficient to establish scienter.

### 5.3 Whether Plaintiffs' Allegations Concerning the Core Operations Inference Are Sufficient to Establish Scienter

■ Plaintiffs also argue that scienter should be inferred because "the events in question were so significant to HP's present and future revenues ... [that] it would be patently unreasonable to suggest that top management was unaware of them." (Opp'n at 9:7–8.) As the Ninth Circuit explained in *South Ferry*, 542 F.3d at 781, "[a]llegations regarding management's role in a corporate structure" and allegations concerning "the importance of the corporate information about which management made false or misleading statements" may raise an inference of scienter "when made *in conjunction with* detailed and specific allegations about management's exposure to [such] information." *Id.* (emphasis added). The relevant facts must be "of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *Zucco Partners*, 552 F.3d at 1000 (quoting *South Ferry*, 542 F.3d at 786 (describing as "exceedingly rare" the "cases in which the core operations inference, without more, is sufficient under the PSLRA")).

Plaintiffs argue that Defendants must have known that their statements concerning HP's commitment to webOS were false

because "Apotheker stated that the Company's PC and printing businesses were 'the core of our business,' [FAC ¶ 98], and that webOS would 'become a very massive, very broad platform,' supplemented by 'wave after wave' of webOS devices, [FAC ¶¶ 10, 12]." (Opp'n at 42:12–15.) But it does not automatically follow from the "core" nature of HP's PC and printer businesses or the anticipated volume of webOS sales that each Individual Defendant was immediately aware of developments in HP's webOS strategy. Indeed, Plaintiffs acknowledge that webOS devices constituted only one component of PSG, the HP business segment housing PCs and printers. (FAC ¶ 36.)

Plaintiffs' vague allegations that the Individual Defendants "directly participated in the management of the Company," were "directly involved in day-to-day operations," and were "privy to confidential proprietary information" are also insufficient to establish an inference of scienter. (Opp'n at 44:9–11 (citing FAC ¶ 30).) Similarly, while "specific admissions from top executives that they are involved in every detail of the company" favor an inference of scienter, *Daou*, 411 F.3d at 1022, Apotheker's characterization of his management style as "hands on" does not trigger the core operations inference.

Plaintiffs do not adequately plead the core operations inference.

### 5.4 Whether Plaintiffs' Allegations Concerning the Timing of Apotheker's Termination Are Sufficient to Establish Scienter

■ Finally, Plaintiffs argue that Apotheker's termination, coming just one month after HP announced the discontinuation of webOS operations, establishes scienter. To support this three-sentence argument, Plaintiffs cite several cases where district courts found that executive terminations contributed to a finding of scienter. But in all of these cases, the terminations were accompanied by particularly troubling allegations. *See, e.g., Middlesex Ret. Sys. v. Quest Software, Inc.*, 2008 WL 7084629, at *9 (C.D.Cal. July 10, 2008) (where former CFO refused to cooperate with Special Committee investigating fraud); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F.Supp.2d 1248, 1273–74 (N.D.Cal.2000) (where company criticized fired executives for engaging in "improprieties" linked to the alleged fraud and announced that they were dismissed "for cause" because they "should have known, or did know, of the accounting problems"). This Court agrees with those courts that have found that "notable departures are not in and of themselves evidence of scienter." *In re Cornerstone Propane Partners, L.P.*, 355 F.Supp.2d 1069, 1093 (N.D.Cal.2005) (noting that "[m]ost major stock losses are often accompanied by management departures, and it would be unwise for courts to penalize directors for these decisions").

### 5.5 Whether Plaintiffs' Allegations as a Whole Are Sufficient to Establish Scienter

■ As noted, courts deciding motions to dismiss claims under § 10(b) and Rule 10b–5 "must first 'determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter.'" *Siracusano*, 585 F.3d at 1180 (quoting *Zucco*, 552 F.3d at 992). None of Plaintiffs' allegations, in isolation, are sufficient to raise this inference. But the inquiry doesn't end there. The Court must also review "all the allegations holistically," *Matrixx*, 131 S.Ct. at 1324, "to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Siracusano*, 585 F.3d at 1180 (quoting *Zucco*, 552 F.3d at 992).

The Court finds that Plaintiffs' allegations, viewed holistically, fail to raise a "strong inference" of scienter. 15 U.S.C. § 78u–4(b)(2). Aside from the arguments addressed in Sections 5.1–5.4, Plaintiffs rely heavily on accounts from the confidential witnesses to establish Defendants' scienter. For example, Plaintiffs cite CW2's statement that there was a "WiFi bug" in the TouchPad and that "(s)he could not imagine a bug 'of that magnitude' not being known at the top." (FAC ¶ 86.) But CW2's mere speculation regarding what Defendants' must have known is not an adequate substitute for allegations purporting to show what Defendants actually knew.

Plaintiffs also allege that CW3 believed that Apotheker must have known about the flaws in the TouchPad because he "imposed many deadlines leading to the release of the TouchPad that CW3 viewed as plainly unattainable." (FAC ¶ 82.) But CW3 does not allege that he or she ever communicated his or her opinion concerning the infeasibility of these deadlines to Apotheker. And CW3's acknowledgment that other HP employees consented to these deadlines actually supports Defendants' argument that Apotheker believed the deadlines to be reasonable. (FAC ¶ 82.)

At other points in the FAC, Plaintiffs appear to allege that Defendants were either unaware that the webOS strategy would ultimately fail or even hopeful that it might succeed. For example, CW2 alleges that "even [in June 2011] it was *not known* when [webOS-based PCs] could be delivered." (FAC ¶ 76.) Far from establishing that Defendants deliberately lied about the readiness of HP's webOS devices, allegations of this sort indicate only that Defendants *did not know* when these devices would be ready for market. Plaintiffs further undermine their scienter allegations by arguing that "Defendants were

forced to disclose the truth and admit that their [webOS] investment had failed" only "*[w]hen it became apparent* that reality could not catch up to their false pronouncements." (Opp'n at 41:22–27 (emphasis added).) If the inevitable demise of the webOS strategy became apparent to Defendants *after* they made their optimistic statements, those statements could not have been *intentionally* false when made.

Finally, the Court notes that Apotheker's March 2011 statement that "[i]f this thing [the TouchPad] is not working out by the end of the year, I'm going to shut it down" does not establish that Apotheker willfully misled the market. (FAC ¶ 82.) The more compelling inference to be drawn from this conditional statement is that Apotheker believed, at least in March 2011, that problems with the TouchPad *could* be fixed before its eventual release. *See Matrixx*, 131 S.Ct. at 1324.

## 5.6 Conclusion

The Court finds that Plaintiffs' allegations of scienter, standing alone and viewed holistically, are insufficient to raise a "strong inference that the [Defendants] acted with the required state of mind." *Matrixx*, 131 S.Ct. at 1324 (quoting 15 U.S.C. § 78u–4(b)(2)(A)). Thus, Plaintiffs fail to state a claim under § 10(b) or Rule 10b–5 of the Exchange Act.

## 6. CONCLUSION

The Court has considered Plaintiffs remaining arguments and finds them unpersuasive. Plaintiffs' § 10(a) and Rule 10b–5 claim fails because the FAC does not adequately allege that Defendants misrepresented material facts intentionally or with deliberate recklessness. Because Plaintiffs' § 20(a) claim is derivative of its § 10(b) and Rule 10b–5 claim, the § 20(a) claim also fails. *See Zucco*, 552 F.3d at

990 ("Section 20(a) claims may be dismissed summarily ... if a plaintiff fails to adequately plead a primary violation of section 10(b).").

### DISPOSITION

Defendants' Motion is GRANTED. Plaintiffs may file an amended pleading within 30 days of this Order.

IT IS SO ORDERED.