**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CITY OF DEARBORN HEIGHTS ACT 345 POLICE & FIRE RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,
*Plaintiff-Appellant*,

v.

ALIGN TECHNOLOGY, INC.; THOMAS M. PRESCOTT; KENNETH B. AROLA,
*Defendants-Appellees*.

No. 14-16814

D.C. No.
5:12-cv-06039-BLF

OPINION

Appeal from the United States District Court
for the Northern District of California
Beth Labson Freeman, District Judge, Presiding

Argued and Submitted October 19, 2016
San Francisco, California

Filed May 5, 2017

Before: ANDREW J. KLEINFELD and MILAN D. SMITH, JR., Circuit Judges, and JOHN A. KRONSTADT,[*] District Judge.

[*] The Honorable John A. Kronstadt, United States District Judge for the Central District of California, sitting by designation.

Opinion by Judge Milan D. Smith, Jr.;
Concurrence by Judge Kleinfeld

---

## SUMMARY[**]

---

### Securities Fraud

The panel affirmed the district court's dismissal, for failure to adequately plead falsity or scienter, of a securities fraud action under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5.

The alleged violations concerned statements by Align Technology, Inc., regarding its goodwill valuation of a subsidiary.

The panel held that the three standards for pleading falsity of opinion statements articulated in *Omnicare, Inc. v. Laborers Dist. Council Constr. Ind. Pension Fund*, 135 S. Ct. 1318 (2015), a case addressing Section 11, apply to Section 10(b) and Rule 10b-5 claims. These three standards are as follows. First, when a plaintiff relies on a theory of material misrepresentation, the plaintiff must allege both that "the speaker did not hold the belief she professed" and that the belief is objectively untrue. Second, when a plaintiff relies on a theory that a statement of fact contained within an opinion statement is materially misleading, the plaintiff must allege that "the supporting fact [the speaker] supplied [is] untrue." Third, when a plaintiff relies on a theory of

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

omission, the plaintiff must allege "facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."  The panel held that to the extent that the Ninth Circuit's prior standard permitted plaintiffs to plead falsity by alleging that "there is no reasonable basis for the belief" under a material misrepresentation theory of liability, the prior standard was "clearly irreconcilable" with *Omnicare*, and was therefore overruled.  The panel held that the plaintiff failed to sufficiently plead falsity under any of the three *Omnicare* standards.

The panel held that the plaintiff also failed to sufficiently plead scienter.  Because the plaintiff inadequately alleged a primary violation of federal securities law, it could not establish control person liability.

Concurring in the judgment, Judge Kleinfeld agreed with the majority's analysis of scienter, which compelled affirmance.  Judge Kleinfeld wrote that the determination whether the *Omnicare* analysis applies to Section 10(b) cases was important and debatable and should have been left for a case in which it had to be made.

---

**COUNSEL**

Amanda M. Frame (argued), Christopher M. Wood, Shawn A. Williams, Andrew S. Love, and Susan K. Alexander, Robbins Geller Rudman & Dowd LLP, San Francisco, California; Darren J. Robbins, Robbins Geller Rudman & Dowd LLP, San Diego, California; for Plaintiff-Appellant.

Caz Hashemi (argued), Nicholas R. Miller, Kelley M. Kinney, and Douglas J. Clark, Wilson Sonsini Goodrich & Rosati, Palo Alto, California, for Defendants-Appellees.

## OPINION

M. SMITH, Circuit Judge:

Plaintiff-Appellant City of Dearborn Heights Act 345 Police & Fire Retirement System (Plaintiff) represents all the investors who purchased stock in Align Technology, Inc. (Align) between January 31, 2012, and October 17, 2012 (the Class Period). Plaintiff alleges that Defendants Align, Align CEO Thomas M. Prescott, and Align CFO Kenneth B. Arola (collectively, Defendants) violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and SEC Rule 10b-5 in connection with statements regarding Align's goodwill valuation of its subsidiary, Cadent Holdings, Inc. (Cadent). The district court dismissed with prejudice Plaintiff's Second Amended Complaint (SAC) for failure to adequately plead falsity or scienter. We affirm the district court for four reasons.

First, we hold that the three standards for pleading falsity of opinion statements articulated in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 135 S. Ct. 1318 (2015), apply to Section 10(b) and Rule 10b-5 claims. Second, we hold that Plaintiff has failed to sufficiently plead falsity under any of the three *Omnicare* standards. Third, we hold that Plaintiff has also failed to sufficiently plead scienter. Fourth, we hold that because Plaintiff has inadequately alleged a primary violation of federal securities law, Plaintiff cannot establish control person liability.

## BACKGROUND

### I.  Factual Allegations

Defendant Align is a Delaware-incorporated company that designs, manufactures, and markets the Invisalign system for treating the misalignment of teeth.  Align also designs, manufactures, and markets 3D digital services and iTero intra-oral scanners for orthodontics and dentists through its wholly-owned subsidiary, Cadent.  Defendant Thomas M. Prescott (Prescott) was President and CEO of Align, and a member of Align's Board of Directors during the Class Period.  Defendant Kenneth B. Arola (Arola) was Align's CFO and Vice President of Finance during the Class Period.  Plaintiff is a public pension fund that purchased common stock of Align during the Class Period.

On March 29, 2011, Align issued a press release announcing its acquisition of Cadent.  In a press conference that same day, Prescott and Arola explained that Cadent was "an attractive, high-growth, strategically valuable asset" that would allow Align to position itself as a major player in the intra-oral scanning market and  "result in new growth opportunities, revenue synergies, increasing strategic leverage, and cost improvements."  The transaction closed on April 29, 2011, at which Align paid $187.6 million for Cadent.  Align allocated $135.5 million of the purchase price as "goodwill," the amount of the purchase price exceeding the fair value of the net assets of the acquired company.  Of this goodwill allocation, $76.9 million was specifically allocated to the acquired computer-aided design and manufacturing (CAD/CAM) and scanner unit (together with CAD/CAM, the SCCS unit).

Plaintiff alleges that Cadent's purchase price, which was justified in part on Cadent's 2010 revenues, was artificially

inflated. According to former Cadent employees cited as confidential sources, Cadent "offered substantial and unprecedented discounts to its customers in the last quarter of 2010" in an attempt to make itself "appear more valuable to an acquirer." This practice (channel stuffing) resulted in an unsustainable 147% increase in scanner sales by Cadent for the 2010 fiscal year. Defendants allegedly had knowledge of Cadent's channel stuffing because the deed would have been "readily apparent" from Align's due diligence and direct access to Cadent's financial reports and company documents through a data room that Cadent made available during the acquisition process.

Align allegedly used Cadent's artificially inflated 2010 revenue as the basis for projecting a 20% sales growth rate and 50% gross margins for the SCCS unit, as well as making its initial goodwill valuation. The SCCS unit's revenue increased sequentially from the fourth quarter of 2011 to the second quarter of 2012, but ultimately failed to meet the projected 20% growth rate in any post-acquisition quarter. The SCCS unit's gross margins also failed to meet the 50% projection, instead ranging from 24% to 36% during the Class Period.

Plaintiff alleges that the SCCS unit's financial results were negatively impacted by a variety of factors. First, as part of an effort to integrate Cadent's infrastructure into Align's, Align moved the SCCS unit from New Jersey to Mexico and Costa Rica in the fourth quarter of 2011. This integration effort involved the firing of 119 full-time Cadent employees before Align employees could be properly trained to assist customers with SCCS products. The firings negatively impacted customer service, a problem which Prescott acknowledged in an April 2012 investor call. Second, Cadent's competitors in the intra-oral scanning

market were developing new products and business strategies. Plaintiff cites to various industry reports suggesting that competitors were "likely to offer superior products at considerably lower prices" in 2012 and predicting a shift to a "no per click or subscription fees" business model, which would potentially eliminate Cadent's revenues generated from services scan fees and 3D digital modeling and lab services. Third, the SCCS unit experienced a severe decline in international revenue in part because of a deteriorating relationship with Cadent's exclusive European distributor Straumann, and the European economic recession at the time. The SCCS unit's international revenue fell from $2.5 million in the third quarter of 2011 to $362,000 during the fourth quarter of 2011. Although international revenues subsequently increased between the fourth quarter of 2011 and the first quarter of 2012, they then fell to a historic low in the second quarter of 2012.

Pursuant to Generally Accepted Accounting Principles (GAAP), a company must conduct an annual test of its goodwill for impairment. Financial Accounting Standards Board Accounting Standards Codification (ASC) Topic 350: Intangibles – Goodwill and Other, ASC 350-20-35-28. "Impairment is the condition that exists when the carrying amount of goodwill exceeds its implied fair value." ASC 350-20-35-2. A company must also conduct additional goodwill testing between annual tests (interim goodwill tests) "if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount." ASC 350-20-25-30.

Align conducted its annual goodwill impairment testing in the fourth quarter of 2011 and found no impairment to the SCCS goodwill valuation of $76.9 million. In its 2011 Form

10-K, Align explained that "[b]ased on the goodwill impairment analysis results during the fourth quarter of 2011, we determined that no impairment needed to be recorded as the fair value of our reporting units were significantly in excess of the carrying value." Align did not conduct any interim goodwill tests or take any interim goodwill impairments in either the first or second quarters of 2012.

On October 17, 2012, Align announced that it was conducting an interim goodwill impairment test for the SCCS goodwill, triggered by the SCCS unit's poor financial performance in the third quarter of 2012 and the termination of its distribution relationship with Straumann. Align warned that this interim testing could possibly result in a significant impairment of the SCCS goodwill. This announcement led to 20 million shares of Align stock being traded in one day, and a 20% decline in Align's stock price. On November 9, 2012, Align announced a goodwill impairment charge of $24.7 million, reducing the SCCS goodwill to $52.6 million. On January 30, 2013, Align announced another goodwill impairment charge of $11.9 million, thereby reducing the SCCS goodwill to $36.6 million. Then, on April 18, 2013, Align announced a final goodwill impairment charge of the remaining SCCS goodwill.

## II. Procedural History

Plaintiff's SAC alleges that Defendants made seven materially false and misleading statements concerning Align's goodwill valuation of Cadent during the Class Period. These alleged misstatements appeared in Align's press releases and Form 8-K, Form 10-K, and Form 10Q filings with the SEC. Count I of the SAC asserts a claim of securities fraud based on these misstatements pursuant to

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. Count II of the SAC alleges that Prescott and Arola committed securities fraud as control persons of Align within the meaning of Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a).

On December 9, 2013, the district court dismissed with leave to amend Plaintiff's First Amended Complaint for failure to plead both falsity and scienter with sufficient specificity. On August 22, 2014, the district court dismissed with prejudice Plaintiff's SAC for failing once again to adequately plead falsity or scienter. Plaintiff subsequently filed this timely appeal.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review *de novo* dismissals under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009). We therefore must "accept the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs, and will hold a dismissal inappropriate unless the plaintiffs' complaint fails to state a claim to relief that is plausible on its face." *Id.* (internal quotation marks and citations omitted).

## ANALYSIS

### I. Section 10(b) and SEC Rule 10b-5 Claim

In Count I of the SAC, Plaintiff alleges that Defendants made false and misleading statements concerning Align's goodwill valuation of Cadent. Plaintiff alleges that Defendants deliberately overvalued the SCCS goodwill when Align conducted its 2011 annual goodwill impairment

test, and continued to do so through the Class Period, thereby injecting falsity into statements concerning Align's goodwill estimates and related financial statements. Furthermore, Plaintiff alleges the existence of facts throughout the Class Period that indicated the need to perform an interim impairment test for the SCCS goodwill much earlier than October 2012, such that Align should have found impairment as early as the fourth quarter of 2011. On the basis of these allegations, Plaintiff identifies the following seven statements about the SCCS goodwill and SCCS unit's general financial condition during the fourth quarter of 2011 and the first and second quarters of 2012 as materially false and misleading:

- **Statement 1** (Press Release on January 30, 2012 and Form 10-K filed February 29, 2012): false or misleading financial results for the fourth quarter of 2011 and fiscal year 2011, wherein Align reported "(a) $649.3 million in total assets; (b) $20.4 million in net profit for [the fourth quarter of 2011]; and (c) [earnings-per-share] of $0.25 for [the fourth quarter of 2011]." Align also reported "$135.3 million in goodwill associated with Cadent, $58.4 million allocated to Clear Aligner and $76.9 million allocated to SCCS."

- **Statement 2** (Form 10-K, filed February 29, 2012): "[D]uring the fiscal year ended December 31, 2011, there were no facts and circumstances that indicated that the fair value of the reporting units may be less than their current carrying amount."

- **Statement 3** (Form 10-K, filed February 29, 2012): "[B]ased on the goodwill impairment analysis results during the fourth quarter of 2011, we determined that

no impairment needed to be recorded as the fair value of our reporting units were significantly in excess of the carrying value."

- **Statement 4** (Press Release on April 23, 2012 and Form 10-Q filed May 8, 2012): false or misleading financial results for first quarter of 2012, wherein Align reported "(a) $670.4 million in total assets; (b) $21.0 million in net profit; and (c) GAAP EPS of $0.26."

- **Statement 5** (Form 10-Q, filed May 8, 2012): Align's first quarter of 2012 Form 10-Q stated that Align performed impairment testing "whenever events or changes in circumstances indicate that the carrying value of such assets may not be recoverable."

- **Statement 6** (Press Release on July 19, 2012 and Form 10-Q filed August 2, 2012): false or misleading financial results for the second quarter of 2012, wherein Align reported: "(a) $744.2 million in total assets; (b) $28.5 million in net profit; and (c) EPS of $0.34."

- **Statement 7** (Form 10-Q): Align's second quarter of 2012 Form 10-Q stated that Align performed impairment testing "whenever events or changes in circumstances indicate that the carrying value of such assets may not be recoverable."

"To plead a claim under section 10(b) and Rule 10b-5, the Plaintiff[] must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a

security; (4) reliance; (5) economic loss; and (6) loss causation." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 603 (9th Cir. 2014). The complaint must also satisfy the dual heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA), which require that the complaint plead both falsity and scienter with particularity. *Zucco*, 552 F.3d at 990–91. Only allegations regarding falsity and scienter are at issue in this appeal.

## A. Falsity

### 1. Classification of Statements 1 through 7

The district court concluded that statements regarding goodwill valuations are opinion statements because they "are inherently subjective and involve management's opinion regarding fair value." Although our circuit has never addressed this issue, the Second Circuit reached the same conclusion on identical reasoning. *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011) ("Estimates of goodwill depend on management's determination of the 'fair value' of the assets acquired and liabilities assumed, which are not matters of objective fact."). Plaintiff does not challenge this characterization with respect to Statements 1, 4, 5, 6, and 7, and we see no reason to conclude otherwise.

However, Plaintiff argues that the district court erroneously found Statements 2 and 3 to be opinion statements. In *Omnicare*, the Supreme Court explained that opinion statements can "contain embedded statements of fact," which "may be read to affirm not only the speaker's state of mind . . . but also an underlying fact." 135 S. Ct. at 1327. Plaintiff argues that Statements 2 and 3 contain "embedded statements of fact": Statement 2 asserts the "fact" that there were "no facts and circumstances"

indicating impairment of the SCCS goodwill, while Statement 3 asserts the "fact" that the SCCS division's fair value "was significantly in excess of the carrying value."

Plaintiff's argument as to Statement 3 is unpersuasive, since Statement 3 expresses Defendants' qualitative assessment of the SCCS division's fair value. Because that reference point itself is subjective, the attendant comment comparing fair value to carrying value cannot be objectively verified. However, Statement 2's reference to "no facts or circumstances" asserts an objectively verifiable fact by identifying an aspect of Defendants' goodwill methodology as opposed to a qualitative aspect of the valuation itself. Accordingly, while the district court properly concluded that Statement 3 is an opinion statement, Statement 2 should be considered an opinion statement with an embedded statement of fact.

### 2. Standard for Pleading Falsity of Opinion Statements

To plead falsity under the PSLRA, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B).

The parties dispute the proper standard for pleading falsity when the alleged misstatements are opinion statements. Plaintiff argues that falsity of opinion statements can be pleaded by alleging facts that demonstrate that "there is no reasonable basis for the belief." *Reese v. Malone*, 747 F.3d 557, 579 (9th Cir. 2014) (quoting *Kaplan v. Rose*, 49 F.3d 1363, 1375 (9th Cir. 1994)). In contrast, the district

court concluded that Plaintiff was required to plead "particularized facts establishing that Defendants did not believe in their statements concerning goodwill at the time they made them."    The district court reached this determination by relying in part upon *Rubke v. Capitol Bancorp, Ltd.*, 551 F.3d 1156 (9th Cir. 2009), which held that for claims under Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k(a), misstatements of opinion "can give rise to a claim . . . only if the complaint alleges with particularity that the statements were *both* objectively and subjectively false or misleading." 551 F.3d at 1162 (emphasis added).  The district court noted that in *Fait v. Regions Financial Corporation*, the Second Circuit had devised an identical falsity pleading standard for opinion statements in Section 11 cases, 655 F.3d at 122, and in *City of Omaha, Nebraska Civilian Employees' Retirement System v. CBS Corp.*, 679 F.3d 64 (2d Cir. 2012) subsequently extended that pleading standard to Section 10(b) cases, *id.* at 67–68.  Defendants argue that the Supreme Court's recent decision in *Omnicare* supports the district court's conclusion that subjective falsity must be pleaded.

Determining the proper pleading standard for falsity of opinion statements requires a close examination of *Omnicare*.  In *Omnicare*, the Supreme Court noted that Section 11 imposes liability for both material misstatements and omissions and thus "creates two ways to hold issuers liable for the contents of a registration statement—one focusing on what the statement says and the other on what it leaves out." 135 S. Ct. at 1323.  With respect to the material misstatement theory of liability, the Supreme Court rejected the Sixth Circuit's holding that "a statement of opinion that is ultimately found incorrect—even if believed at the time made—may count as an 'untrue statement of material fact'" under Section 11.  *Id.* at 1325 (quoting 15 U.S.C. § 77k(a)).

The Supreme Court explained that such a standard "wrongly conflates facts and opinions" because "a statement of fact . . . expresses certainty about a thing, whereas a statement of opinion . . . does not," and concluded that Congress codified this distinction in the first clause of Section 11 by creating liability only for "untrue statement[s] of . . . *fact*." *Id*. at 1325–26 (internal quotation marks omitted) (alteration in original).  The Supreme Court further clarified that expressions of opinion "explicitly affirm[] one fact: that the speaker actually holds the stated belief," and liability therefore follows only if the speaker does not honestly hold the stated belief and the belief is objectively incorrect. *Id*. at 1326; *see also id*. at 1326 n.2.  Thus, *Omnicare* affirms *Rubke*'s requirement that both objective and subjective falsity must be alleged to sufficiently plead falsity for a Section 11 claim based on a material misrepresentation theory of liability.

However, *Omnicare* articulated a different method for pleading falsity under an omissions theory of liability.  The Supreme Court explained that a reasonable investor "expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time." *Id*. at 1329.  Liability therefore attaches when "a registration statement omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion" and "those facts conflict with what a reasonable investor would take from the statement itself." *Id*.  But the Supreme Court cautioned that pleading falsity under an omissions theory would be "no small task for an investor." *Id*. at 1332.  A plaintiff "cannot just say that the issuer failed to reveal [the] basis" for the opinion at issue. *Id*.  Instead, an investor must "call into question the issuer's basis for offering the opinion" by "identify[ing] particular (and material) facts going to the

basis for the issuer's opinion—facts about the inquiry the insurer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* Furthermore, liability is not necessarily established by demonstrating that "an issuer knows, but fails to disclose, some fact cutting the other way," because "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts." *Id.* at 1329. And finally, "whether an omission makes an expression of opinion misleading always depends on the context," which includes "all its surrounding text, including hedges, disclaimers, and apparently conflicting information." *Id.* at 1330.

As discussed in the preceding section, *Omnicare* also recognized that some opinion statements "contain embedded statements of fact," which "may be read to affirm not only the speaker's state of mind . . . but also an underlying fact." *Id.* at 1327. For such statements, the Supreme Court held that falsity could be established "not only if the speaker did not hold the belief she professed but also if the supporting fact she supplied were untrue." *Id.* at 1327.

Accordingly, *Omnicare* establishes three different standards for pleading falsity of opinion statements. First, when a plaintiff relies on a theory of material misrepresentation, the plaintiff must allege both that "the speaker did not hold the belief she professed" and that the belief is objectively untrue. *Id.* Second, when a plaintiff relies on a theory that a statement of fact contained within an opinion statement is materially misleading, the plaintiff must allege that "the supporting fact [the speaker] supplied [is] untrue." *Id.* Third, when a plaintiff relies on a theory of omission, the plaintiff must allege "facts going to the basis

for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 1332.

Although *Omnicare* concerned Section 11 claims, we conclude that the Supreme Court's reasoning is equally applicable to Section 10(b) and Rule 10b-5 claims. The Supreme Court's definition of opinion statements and differentiation of them from factual statements was specific to Section 11 only to the extent that Section 11 imposes liability for "untrue statement[s] of . . . *fact.*" *Id.* at 1326 (alterations in original) (citing 15 U.S.C. § 77k(a)). Rule 10b-5, which was promulgated pursuant to Section 10(b), contains an identical limitation of liability to "untrue statement[s]" and omissions of "fact." 17 C.F.R. § 240.10b-5(b); *see also City of Omaha*, 679 F.3d at 68 ("[Section 10(b) and Section 11] claims all share a material misstatement or omission element."). The only other circuit to have considered *Omnicare*'s effect on the falsity pleading standard for Section 10(b) claims based on opinion statements has held that the reasoning of *Omnicare* applies. *Tongue v. Sanofi*, 816 F.3d 199, 209–10 (2d Cir. 2016) (noting that *Omnicare* "refined the standard for analyzing whether a statement of opinion is materially misleading" and applying *Omnicare* to Section 10(b) claims). We are likewise so persuaded, and we therefore hold that the three standards for pleading falsity under *Omnicare* also apply to Section 10(b) and Rule 10b-5 claims.

We recognize that *Omnicare* establishes a falsity pleading standard for opinion statements that is substantively similar to the current standard within this circuit, which allows plaintiffs to establish falsity in three ways: "if (1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is

aware of undisclosed facts tending seriously to undermine the statement's accuracy." *Reese*, 747 F.3d at 579 (quoting *Kaplan*, 49 F.3d at 1375). The first and third methods of pleading falsity under this standard are consistent with *Omnicare*'s standards for pleading falsity under the material misrepresentation theory of liability and the omission theory of liability, respectively. However, *Omnicare* clarifies that pleading falsity by alleging that "there is no reasonable basis for the belief" is permissible only under an omissions theory of liability, subject to the principles discussed above. We thus hold that to the extent our current standard permits plaintiffs to plead falsity by alleging that "there is no reasonable basis for the belief" under a material misrepresentation theory of liability, it is "clearly irreconcilable" with *Omnicare*, and is therefore overruled. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).

### 3. Application of the Falsity Pleading Standard

The SAC does not satisfy any of the *Omnicare* pleading standards for falsity. The SAC contains no allegations that Defendants (1) believed that SCCS's goodwill was impaired at the end of 2011 or during the first and second quarters of 2012, (2) did not believe that Align performed impairment testing when required, and (3) did not believe that SCCS's fair value was "significantly in excess of the carrying value." As such, the SAC contains no allegations of subjective falsity.

Nor has Plaintiff pleaded sufficient facts that would allow us to infer subjective falsity. Plaintiff contends that Defendants must have known that the SCCS goodwill was impaired and that their goodwill valuations finding no impairment were false. First, Plaintiff alleges that Defendants were aware that Cadent improperly inflated its

2010 annual revenue numbers prior to being acquired by Align in April 2011. And, because Defendants made the initial $76.9 million SCCS goodwill valuation based on Cadent's 2010 revenue numbers, Plaintiff alleges that Defendants must have known that their finding of no impairment to the SCCS goodwill in the fourth quarter of 2011 was false. Second, Plaintiff alleges that based on the SCCS unit's financial results and changes in the market during the Class Period, Defendants must have known that there was likely impairment to the SCCS goodwill pursuant to GAAP. Plaintiff notes that: (1) the SCCS division's revenues never met the projected 20% growth rate during the Class Period; (2) gross margins fell from roughly 45% to a range of 24% to 36% after Align acquired Cadent; (3) international sales declined by roughly 86% during the fourth quarter of 2011; (4) new competitors emerged offering improved products and alternative fee structures; and (5) the integration effort in the fourth quarter of 2011 created customer support problems for SCCS products. Third, Plaintiff submits its own calculations showing impairment to the SCCS goodwill under both the market approach and the income approach, two methods of calculating goodwill upon which Defendants purportedly relied.

This theory of falsity suffers from two flaws. First, Plaintiff fails to plead any facts establishing that Defendants continued to use Cadent's inflated 2010 revenue figures in conducting its goodwill impairment testing for the SCCS unit. While Plaintiff relies on confidential informants to substantiate the allegations of Cadent's channel stuffing, none of these witnesses subsequently participated in Align's accounting or goodwill analysis. Plaintiff's confidential informants therefore cannot link Cadent's channel stuffing to Defendants, much less the set of assumptions that

Defendants used to conduct its goodwill valuation of the SCCS unit at the end of 2011.

Second, the SCCS unit's financial results and changes in the market during the Class Period do not compel a finding of goodwill impairment under GAAP. Pursuant to GAAP, a company should conduct interim goodwill impairment testing "if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount." ASC 350-20-35-30. Examples of such events and circumstances include "a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods," as well as "an increased competitive environment . . . [or] change in the market for an entity's products or services." ASC 350-20-35-3C. The circumstances and events identified by Plaintiff, as enumerated above, fall into these categories. However, in determining whether goodwill impairment is "more likely than not," a company must also assess "the totality of events" as well as any "positive and mitigating events." ASC 350-20-35-3E and ASC 350-20-35-3F. Furthermore, "none of the individual examples of events" suggesting potential goodwill impairment are "intended to represent standalone events . . . that necessarily require an entity" to perform interim testing. ASC 350-20-35-3G.

Here, there were positive and mitigating events that Align could have found to either balance or outweigh the events and circumstances identified by Plaintiff. First, although SCCS revenue did not meet Align's projection of 20% growth, SCCS revenue increased sequentially each quarter, from $10 million in the fourth quarter of 2011 to $11.8 million in the first quarter of 2012 to $11.9 million in the second quarter of 2012. Second, although international

sales declined from $2.5 million in the third quarter of 2011 to $362,000 in the fourth quarter of 2011, international sales increased to $631,000 in the first quarter of 2012. Third, although Plaintiff cites to industry analyst reports that warned that Cadent would soon face competitors offering "superior products at considerably lower prices" as well as more favorable fee structures, the SAC does not identify a single competing product that emerged on the market or a single competitor who offered such a fee structure during the Class Period. Thus, Plaintiff's bare allegations of events and circumstances during the Class Period that could have suggested the likelihood of goodwill impairment under GAAP cannot establish that Defendants must have known there was a likelihood of goodwill impairment.

The common element underlying both flaws in Plaintiff's theory of falsity is Plaintiff's failure to allege the actual assumptions that Defendants relied upon in conducting their goodwill analysis. Without this allegation, it cannot be plausibly inferred that Defendants intentionally disregarded the aforementioned events and circumstances when conducting their goodwill analysis, such that the goodwill valuations were knowingly false or misleading when made. Plaintiff's pleading of its own calculations indicating impairment of the SCCS goodwill in the fourth quarter of 2011 does not provide a sufficient substitute for Plaintiff's failure to plead the actual assumptions used by Defendants. As aptly noted by the district court, "[t]hat Plaintiff selected certain assumptions to reach a conclusion of impairment does not demonstrate what assumptions *Align* made in conducting its 4Q11 impairment analysis, nor does it suffice to show that Align's selection of different assumptions would have been so unreasonable as to amount to fraud." Because Plaintiff does not sufficiently allege subjective falsity, Plaintiff fails to plead falsity under a

material misstatement theory of liability with respect to Statements 1, 3, 4, 5, 6, and 7.

Plaintiff's falsity pleadings fare no better when construed under an omissions theory of liability. In its reply brief, Plaintiff contends that Defendants omitted three material facts: (1) Cadent's "channel stuffing," which allegedly inflated Defendants' initial growth projections for SCCS, (2) the aforementioned integration issues and market competition, which allegedly affected SCCS's fair value, and (3) that Defendants allegedly failed to conduct any goodwill impairment testing at year-end 2011, which would have revealed "significant impairment to the scanner division's goodwill." Plaintiff argues that all three omissions "are indisputably material, were never disclosed, and effectively rendered [D]efendants' goodwill valuation statements – which proclaimed there was no impairment – misleading if not entirely false."

Plaintiff's omissions theory of liability fails because none of the three alleged omissions "call[s] into question the issuer's basis for offering the opinion." *Omnicare*, 135 S. Ct. at 1332. First, for the reasons discussed above, Plaintiff pleads no facts establishing that Defendants used the inflated 2010 revenues that resulted from Cadent's channel stuffing to conduct its goodwill impairment testing at the end of 2011, and also fails to plead the exact assumptions that Defendants used. Without any allegations tying Cadent's channel stuffing to any of Defendants' goodwill valuations, a reasonable investor would not find the fact of Cadent's channel stuffing, which occurred in 2010, to undermine Align's conclusion at the end of 2011 that the SCCS goodwill was not impaired.

Second, the record indicates that Defendants publicly disclosed both Align's integration issues and the risk posed by market competitors.  As early as May 5, 2011, Align warned through its Form 10-Q filing that "the anticipated financial [and] strategic benefits" of acquiring Cadent might be impeded by potential risks which included "aggressive competition from other manufacturers of intraoral scanners" which could result in "price reductions and loss of sales." And with respect to Align's integration issues, Prescott explained during an April 2012 investor call that "in the course of creating a more integrated business we have negatively impacted several important customer-facing functions like customer service, tech support, and even delivery schedules in some cases."

Third, Plaintiff's allegation that Defendants failed to conduct any goodwill impairment testing at the end of 2011 is not a *fact*, but rather Plaintiff's *conclusion* based on its belief that no set of reasonable assumptions could support Defendants' determination in the fourth quarter of 2011 that the SCCS goodwill was unimpaired.  We need go no further in concluding that it cannot serve as an omission of fact that sufficiently pleads falsity.  Because Plaintiff cannot identify any material facts omitted by Defendants, Plaintiff fails to plead falsity under an omissions theory of liability with respect to Statements 1, 3, 4, 5, 6, and 7.

Finally, Plaintiff's failure to allege the assumptions underlying Defendants' goodwill valuations of the SCCS unit also prevents Plaintiff from pleading objective falsity as to Statement 2. Without identifying what negative factors and assumptions Defendants already incorporated into their goodwill valuations, Plaintiff cannot demonstrate that Defendants were aware of additional "facts and circumstances" that would have indicated that "the fair value

of the [SCCS division] may be less than [its] carrying amount."

In sum, the district court correctly determined that Plaintiff has failed to plead falsity with respect to all seven of Defendants' alleged misstatements. We therefore affirm the district court's dismissal of Count I of the SAC.

## B. Scienter

Plaintiff has also failed to adequately plead scienter, which serves as an independent basis to affirm the district court's dismissal of Count I of the SAC. Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). A defendant is liable under Section 10(b) and Rule 10b-5 when he acts with scienter, a "mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Schueneman v. Arena Pharm.*, *Inc.*, 840 F.3d 698, 705 (9th Cir. 2016) (internal citation and quotation marks omitted). "[D]eliberate recklessness is 'an *extreme* departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it.'" *Id.* (quoting *Zucco*, 552 F.3d at 991). As such, "[f]acts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable inference of intent, but are not sufficient to establish a strong inference of deliberate recklessness." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). Moreover, a strong inference of scienter must be "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). When analyzing the sufficiency of a plaintiff's scienter

pleadings, we first "determine whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter." *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011). "[I]f no individual allegation is sufficient, we conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id.*

Plaintiff fails to establish a strong inference that Defendants either knew or were deliberately reckless in ignoring that the SCCS goodwill was significantly inflated during the Class Period. Plaintiff argues that a strong inference of scienter is established by a combination of (1) Defendants' knowledge of Cadent's alleged channel stuffing as well as the aforementioned facts that purportedly contradicted their goodwill valuations; (2) the temporal proximity between Defendants' alleged misstatements and the SCCS goodwill writedown and the magnitude of the writedown; (3) Prescott and Arola's stock sales during the Class Period; and (4) Arola's resignation as Vice President of Finance.

First, particularized allegations that defendants had "actual access to the disputed information" may raise a strong inference of scienter. *Reese*, 747 F.3d at 575 (internal quotation mark omitted). With respect to Cadent's channel stuffing, Plaintiff alleges insufficient facts to establish that Prescott and Arola had direct knowledge of Cadent's channel stuffing. According to Plaintiff's confidential informants, Cadent's channel stuffing would have been "readily apparent" from Cadent's financial documents, which Align had direct access to through the data room that Cadent set up for potential buyers. But Plaintiff does not allege that Prescott or Arola personally accessed the data

room, or that the confidential informants personally disclosed Cadent's channel stuffing to Prescott or Arola.

Plaintiff attempts to indirectly establish Defendants' knowledge of Cadent's channel stuffing through the core operations theory of scienter. Under the core operations theory, "[a]llegations regarding management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements may also create a strong inference of scienter when made in conjunction with detailed and specific allegations about management's exposure to factual information within the company." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008). Plaintiff argues that the core operations theory is met here because (1) Align proclaimed goodwill to be one of Align's "critical accounting policies," (2) Prescott and Arola announced Align's financial results each quarter and signed Align's SEC filings, (3) Prescott and Arola both had significant involvement in the acquisition of Cadent, and (4) Align performed goodwill impairment testing in the fourth quarter of 2011. While these allegations may be sufficient to establish Prescott's and Arola's knowledge of *Align's* financial information, they do not establish "management's exposure" to *Cadent's* financial information, especially given that Cadent's channel stuffing occurred in 2010 and predated Align's acquisition of Cadent.

With respect to Cadent's financial results and changes in the market during the Class Period, Defendants cannot contest knowledge of these facts, as they are drawn from Align's SEC filings and press releases. However, Defendants' knowledge of these facts, at most, establish only that Defendants may have committed GAAP violations in determining that no interim goodwill impairment testing was

required. But we have held that "a failure to follow GAAP, without more, does not establish scienter." *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994) (quoting *Malone v. Microdyne Corp.*, 26 F.3d 471, 479 (4th Cir. 1994)). This is because GAAP "tolerate[s] a range of reasonable treatments, leaving the choice among alternatives to management." *Or. Pub. Emps. Ret. Fund*, 774 F.3d at 609 (quoting *Thor Power Tool Co. v. C.I.R.*, 439 U.S. 522, 544 (1979)).

Plaintiff's theory of scienter based on Defendants' failure to conduct interim goodwill impairment testing illustrates the inability of GAAP violations alone to provide evidence of scienter. As discussed above, a company need only conduct interim goodwill impairment testing if it concludes, after assessing "the totality of events" as well as any "positive and mitigating events," ASC 350-20-35-3E and ASC 350-20-35-3F, that negative events or circumstances "would more likely than not" cause impairment. ASC 350-20-25-30. In other words, a corporation must exercise its judgment in assessing both positive and negative factors when determining whether interim goodwill impairment testing is necessary. It therefore follows that a corporation's mere knowledge of negative factors that potentially indicate goodwill impairment does not of itself support an inference that a corporation acted with scienter in exercising its judgment to conclude that no goodwill impairment is likely to occur. To plead an inference of scienter in this context, a plaintiff must allege additional facts that call into question the manner in which the corporation conducted its goodwill analysis.

But here, Plaintiff has failed to allege the precise assumptions that Defendants used in conducting the 2011 year end goodwill valuation of the SCCS goodwill and in

determining that no interim goodwill valuation analysis was needed in the first and second quarters of 2012. Without these allegations, we agree with the district court that "[i]t is not known what significance Align accorded to the triggering circumstances that Plaintiff has identified, nor what positive and mitigating factors were considered in determining that interim impairment analysis was not warranted." As such, the more compelling inference is that Defendants made a good faith but mistaken determination in its goodwill valuations that the positive factors outweighed the negative ones.

Second, stock sales by corporate insiders "[are] suspicious only when [they are] 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" *Zucco*, 552 F.3d at 1005 (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999)). To make this determination, we look to three factors: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.* (quotation marks omitted). The SAC primarily relies upon a conclusory allegation that Prescott and Arola sold "hundreds of thousands of shares" to "reap[] over $14.8 million in unlawful proceeds" during the Class Period and thus fails to allege the precise amount of shares sold, the timing of these sales, and the prior trading history for either individual. Although Plaintiff does allege the price and quantity of a single sale that Prescott made on February 29, 2012, the timing of this sale is inconsistent with insider trading "calculated to maximize the personal benefit from undisclosed inside information." *Zucco*, 552 F.3d at 1005 (internal quotation marks omitted). Of the 322,751 shares that Prescott sold on February 29, 2012, Prescott obtained a

price of $25.51 per share for 252,751 shares and $26.26 per share for 70,000 shares. However, the Align stock price not only subsequently reached a Class Period high of $39.17 per share (on September 13, 2012), but also closed at $28.18 per share on the last day of the Class Period when Align first announced the potential of significant impairment to the SCCS goodwill (October 17, 2012). Prescott thus obtained a price on February 29, 2012 that is even lower than the price he could have obtained had he waited until the allegedly undisclosed SCCS goodwill impairment was actually disclosed. As we have previously explained, "[w]hen insiders miss the boat this dramatically, their sales do not support an inference that they are preying on ribbon clerks who do not know what the insiders know." *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001). Prescott's and Arola's stock sales during the Class Period therefore cannot contribute to an inference of scienter.

Third, an employee's resignation supports an inference of scienter only when "the resignation at issue was uncharacteristic when compared to the defendant's typical hiring and termination patterns or was accompanied by suspicious circumstances." *Zucco*, 552 F.3d at 1002. Otherwise, "the inference that the defendant corporation forced certain employees to resign because of its knowledge of the employee's role in the fraudulent representations will never be as cogent or as compelling as the inference that the employees resigned or were terminated for unrelated personal or business reasons." *Id.* Plaintiff argues that Arola's resignation was accompanied by the suspicious circumstance of coinciding with Align's announcement on January 30, 2013, that it would record a goodwill impairment charge of $11.9 million. This amounts to a "[m]ere conclusory allegation[] that a financial manager resigns or retires . . . shortly before the corporation issues its

restatement," which "without more, cannot support a strong inference of scienter." *Id.* Moreover, the fact that Arola remained an employee of Align for an additional six months after the first goodwill impairment announcement was made further diminishes any inference of scienter based on his resignation. *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014) (declining to find scienter on the basis of executive departures in part because "two of the three individuals remained at NVIDIA in some type of advisory role").

The only remaining allegations that contribute to an inference of scienter are the timing and magnitude of the SCCS goodwill write downs. But neither allegation alone establishes a strong inference of scienter or contributes strongly to such an inference. *Yourish v. Cal. Amplifier*, 191 F.3d 983, 997 (9th Cir. 1999) (explaining that "temporal proximity of an allegedly fraudulent statement or omission and a later disclosure" is insufficient on its own to establish scienter and can only "bolster" an inference based on other allegations); *Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1077 (C.D. Cal. 2012) (surveying cases and concluding that the magnitude of a write down plays a "minor role in the scienter analysis").

With only the timing and magnitude of the SCCS goodwill writedowns contributing to an inference of scienter, we conclude that the "plausible, nonculpable explanations" for Defendants' conduct outweigh the "inferences favoring" Plaintiff. *Tellabs*, 551 U.S. 323–24. Plaintiff has failed to establish an inference of scienter that is at least as compelling as the opposing inference that Defendants exhibited poor business judgment in overpaying for Cadent and determining that no impairment was necessary during the Class Period. We therefore affirm the

district court's dismissal of Count I of the SAC on this basis as well.

## II. Control Person Liability, Section 20(a) Claim

In Count II of the SAC, Plaintiff alleges that Prescott and Arola violated Section 20(a) of the Securities Exchange Act as control persons of Align.  Under Section 20(a), "a defendant employee of a corporation who has violated the securities laws will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates 'a primary violation of federal securities law' and that 'the defendant exercised actual power or control over the primary violator.'"  *Zucco*, 552 F.3d at 990 (quoting *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003)). Plaintiff alleges that both Prescott and Arola knowingly or recklessly participated in the fraudulent scheme to misreport the SCCS goodwill because both individuals, by virtue of their positions within Align, possessed the "power and authority to control the contents of Align's quarterly reports [and] press releases" and had "access to material non-public information" that they knew was being concealed from the public.

For the reasons explained in the preceding sections, Plaintiff has not sufficiently alleged violations of Section 10(b) and Rule 10b-5.  And, without "a primary violation of federal securities law," Plaintiff cannot establish control person liability. *Id.* (quotation marks omitted).  We therefore affirm the district court's dismissal of Count II of the SAC.

## CONCLUSION

For the foregoing reasons, the district court's dismissal with prejudice of Plaintiff's SAC for failure to plead falsity

and scienter is AFFIRMED. Plaintiff shall bear costs on appeal. Fed. R. App. P. 39(a)(2).

---

KLEINFELD, Senior Circuit Judge, concurring in the judgment:

I concur. The majority opinion is compelling on the record before us, with respect to lack of scienter. Because scienter is an element of section 10(b) liability, the reasoning in Part I.B., with which I fully agree, compels the result we reach.

The majority provides an alternative ground for reaching the same result, under the Supreme Court decision in *Omnicare Inc., v. Laborers District Council Construction Industry Pension Fund*.[1] That was a section 11 case. This is a section 10(b) case. As the Supreme Court explained in *Herman & MacLean v. Huddleston*, section 10(b) and section 11 are materially different.[2] The majority holds that the reasoning in *Omnicare* effectively overrules our decision in *Reese v. Malone*.[3] Under *Miller v. Gammie*[4] and its progeny, the tension between *Reese* and *Omnicare* and the doubt *Omnicare* casts on our analysis in *Reese* does not suffice to overrule *Reese*. *Reese* has to be "clearly

---

[1] 135 S. Ct. 1318 (2015).

[2] 459 U.S. 375, 380–84 (1983).

[3] 747 F.3d 557 (9th Cir. 2014).

[4] 335 F.3d 889 (9th Cir. 2003) (en banc).

irreconcilable" with *Omnicare* for *Reese* to be overruled.[5] Whether it is clearly irreconcilable strikes me as debatable, because *Omnicare* is a section 11 case and *Reese* is a section 10(b) case.

I do not suggest that *Reese* survives.  My concern is that it is an important and debatable question, one that we need not decide, and therefore one that we ought not to decide.[6] The delicacy of the question arises from the considerable differences, noted in *Herman*, between section 11 and section 10(b), as well as the pleading difference, Federal Rule of Civil Procedure 9(b) for section 10(b) claims and Federal Rule of Civil Procedure 8(a) for section 11 claims unless they are grounded in fraud.[7]  Though I might well agree with the majority that the *Omnicare* analysis applies to section 10(b) cases, I think it is wiser to leave that arguable and important determination to a case where it has to be made.

---

[5] *Id.* at 900.

[6] *See Nat'l. Fed. of the Blind v. United Airlines*, 813 F.3d 718, 745–47 (9th Cir. 2016) (Kleinfeld, J. concurring).

[7] *In re Rigel Pharm., Inc. Sec. Litig*, 697 F.3d 869, 875–77, 885–86 (9th Cir. 2012).