**NOT FOR PUBLICATION**

**FILED**

UNITED STATES COURT OF APPEALS

AUG 17 2017

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| MICHAEL CUTLER, Lead Plaintiff, | No. 15-56897 |
| Plaintiff-Appellant, | D.C. No. 2:14-cv-02066-CBM-E |
| and | |
| MICHAEL J. ANGLEY, | MEMORANDUM* |
| Plaintiff, | |
| v. | |
| ERIC W. KIRCHNER; et al., | |
| Defendants-Appellees. | |

Appeal from the United States District Court
for the Central District of California
Consuelo B. Marshall, District Judge, Presiding

Argued and Submitted June 7, 2017
Pasadena, California

Before: THOMAS, Chief Judge, REINHARDT, Circuit Judge, and KORMAN,**
District Judge.

---

\* This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

\*\* The Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

We assume familiarity with the facts as presented in the complaint. Lead plaintiff Michael Cutler alleges two theories of securities fraud: First, he claims UTi told investors that the 1View rollout was going well, while its invoicing delays were in fact putting the company in mortal danger. We call that the "slow invoice theory." Second, he alleges that UTi told investors the company's internal controls over financial reporting were functioning effectively, while they were actually suffering from a material weakness. We call that the "accounting problems theory."

To state a claim under SEC Rule 10b-5, Cutler must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008). Each of those elements must be pled with particularity in accordance with Federal Rule of Civil Procedure 9(b). *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014).

## I.    Loss Causation

To plead loss causation, Cutler must provide "sufficient detail to give [the] defendants . . . notice of [his] loss causation theory, and give us some assurance that the theory has a basis in fact." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989–90 (9th Cir. 2008). Our traditional approach tests whether a misstatement

caused loss by asking whether "subsequent public disclosures" revealed or at least suggested the truth, *see Apollo Group*, 774 F.3d at 608, and whether that revelation "was a substantial factor in causing a decline in the security's price," *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1119 (9th Cir. 2013) (internal citation and quotation marks omitted).

If the defendants' statements about 1View's progress were materially misleading, the slow invoice theory states a plausible claim that those statements caused Cutler's losses. 1View was the signal project for UTi's executive team, and a matter of keen interest to the company's investors. For months, UTi executives assured investors, in essence, that the project was going according to plan. A reasonable investor could plausibly have understood UTi's subsequent disclosure—that 1View's invoicing difficulties materially contributed to a liquidity crisis—to indicate that the company's prior assurances that things were going well had been false or misleading. And it is eminently plausible that such a revelation about such a critical program was a substantial factor in causing UTi's stock price to collapse.

The accounting problems theory, however, does not adequately allege loss causation. UTi announced in March of 2014 that it had identified a material weakness in its internal financial controls. "Internal control over financial reporting" is a defined term in the SEC's regulations, describing a particular set of accounting processes. *See* 17 C.F.R. § 240.13a-15(f). The basic shortcoming of the accounting

3

problems theory is one of timing. UTi expressly disclosed a weakness in its financial controls at the end of March 2014, but Cutler alleges that his loss occurred a month earlier, when UTi made its other disclosures at the end of February. To overcome this disjunct, Cutler must allege that markets understood the February disclosure of delayed invoicing to indicate a material weakness in UTi's internal financial controls, and that that understanding contributed to a fall in its share price.

The complaint, however, presents no factual details that would tip that claim from possibility into plausibility. Internal financial controls go to a company's *accounting* practices—its ability to accurately track revenues as they are realized and cash as it comes in the door. None of those functions are called into question by delayed invoicing; as the defendants point out, UTi operated under accounting rules that decoupled revenue recognition from invoice generation, and nothing about getting money late implies tracking it inaccurately.

Cutler also contends that he has alleged loss causation under the "materialization-of-the-risk" approach. We have not yet ruled on the merits of that test, *Nuveen*, 730 F.3d at 1122 n.5, and do not do so here because it would make no difference to the outcome of this case.

## II.   Actionable Misstatements

We now turn to whether Cutler pleads the existence of any actionably misleading statements in support of the slow invoice theory. We consider only those

4

statements which Cutler has actually raised on appeal. To plead a misstatement actionable under Rule 10b-5, Cutler must allege that a defendant 1) made 2) a false or misleading statement, that is 3) material, and 4) not immunized from liability by the safe harbor provisions of the Private Securities Litigation Reform Act ("PSLRA"). Per the PSRLA and Rule 9(b), falsity and materiality must be pled with particularity, specifying the reason why each statement was misleading. *See* 15 U.S.C. § 78u-4(b)(1). Cutler has raised fourteen statements on appeal that relate to the slow invoice theory, which we group into two categories.

The first category contains five risk disclosures made in reports to the SEC signed by CEO Eric Kirchner and CFO Richard Rodick. *See SEC v. Jensen*, 835 F.3d 1100, 1112 (9th Cir. 2016) (corporate officers are considered to have made statements in filings that they sign). Cutler challenges the following five disclosures:

- **Disclosure 1** (Form 10-K filed April 1, 2013): "We are currently engaged in a multi-year business transformation initiative that involves risks, could result in higher than expected costs and/or could otherwise adversely impact our operations [and/or] profitability."

- **Disclosure 2** (Form 10-K filed April 1, 2013): "We may . . . experience difficulties consolidating our current systems, moving to a common set of operational processes, implementing shared services and implementing a successful change management process. These difficulties may impact our clients and our ability to efficiently meet their needs."

- **Disclosure 3** (Form 10-K filed April 1, 2013): "We make significant advances and disbursements on behalf of our clients for transportation costs . . . . If we are unable to recover a significant portion of these disbursements . . . in a timely manner, we may experience losses and our cash flows and results of operations would be negatively impacted."

- **Disclosure 4** (Form 10-Q filed June 7, 2013): "There have been no material changes to the risk factors as disclosed . . . on Form 10-K."

- **Disclosure 5** (Form 10-Q filed September 9, 2013): "There have been no material changes to the risk factors as disclosed . . . on Form 10-K."

These statements were misleading because they disclosed a risk "in the abstract" but omitted the fact that it had "already . . . come to fruition." *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) (internal quotation marks omitted). In the wake of the February 2014 disclosures, the defendants admitted that invoicing delays had routinely slowed collections in countries that switched to 1View. The company came to expect these problems, and made efforts to fix them. That is enough to conclude that the risk disclosures were misleading.

The second category of challenged statements were made by individual UTi executives during earnings calls and investor conferences. We treat each executive's statements as also made by UTi. *In re Chinacast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015). Cutler raises nine such statements on appeal:

- **Individual Statement 1** (Earnings Call on March 28, 2013) (Feitzinger): "As you get to the five or six country phase [in the 1View rollout], . . . that's where you test the system to see whether it scales. That's where you see how the change management's working, as people adopt their processes to the system and the different countries. And that's kind of what's behind us now at this point."

6

- **Individual Statement 2** (Earnings Call on March 28, 2013) (Rodick[1]): "[T]he system is now ready to scale. So, the system itself will be able to handle the additional transactions as we add the volume into it."

- **Individual Statement 3** (Earnings Call on June 6, 2013) (Kirchner): "[1View] is performing well."

- **Individual Statement 4** (Earnings Call on June 6, 2013) (Kirchner): "[G]enerally, the platforms and process improvement on both sides are definitely in place, and in freight forwarding, it's about leveraging what you have in place, and then even be able to leverage that even further once the system is in place."

- **Individual Statement 5** (Earnings Call on September 6, 2013) (Kirchner): "The US launch is a notable milestone for UTi . . . . We've demonstrated that [1View] works, the deployment in the recently added large countries shows that it's scalable."

- **Individual Statement 6** (Presentation to RBC Capital Markets Global Industrials Conference on September 10, 2013) (Rodick): "We built a platform that we can integrate [acquisitions] quickly and really not only get the revenue, but take the cost out. So I think we can do these things pretty quick."

- **Individual Statement 7** (Presentation to RBC Capital Markets Global Industrials Conference on September 10, 2013) (Rodick): "[T]he transformation, I think that everybody believes we've proven, especially with US going live, we got that . . . . There won't be as much focus on getting the transformation done as there has been . . . , because now we've proven it works."

- **Individual Statement 8** (Presentation to Morgan Stanley Industrials & Autos Conference on September 17, 2013) (Misakian): "I would say on balance things are—the system is performing as we would expect it to right now. But we have had some issues as we've gone through. We have found that when we launch the system and specific markets that some of the standardized processes and procedures we put in place were not being

---

[1] The parties have each submitted transcripts that conflict as to whether Kirchner or Rodick made this statement. This factual dispute is not properly presented at the pleading stage, where the complaint's allegation that Rodick made the statement is controlling.

followed entirely. So each market was not as standard as we thought it would be. And that caused things to slow down a little bit."

- **Individual Statement 9** (Earnings Call on December 5, 2013) (Kirchner): "I think that we've made excellent progress. The fact that we've got more than—or half of our transactions in [1View] today, and it's functioning and working and we're seeing the benefits that we expected in terms of how that system performs, I think we're doing a great job with that."

Cutler alleges that these statements of opinion were misleading because they omitted the fact that as 1View rolled out, it was causing a decline in cash collections in essentially every new country. To state such a claim, Cutler must allege "facts going to the basis for the . . . opinion whose omission makes the . . . statement . . . misleading to a reasonable person reading the statement fairly and in context." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017) (internal quotation marks and modifications omitted). It is plausible that a reasonable investor, hearing that 1View was "working," "ready to scale," and capable of integrating acquisitions "quickly" would have "the impression of a state of affairs" materially different from the reality that 1View caused up to a half-year decline in cash collections in each country it rolled out to. *See In re Cutera Sec. Litig.*, 610 F.3d 1103, 1109 (9th Cir. 2010) (internal citation and quotation marks omitted).

The defendants also argue that the individual statements are immaterial. We disagree. Individual Statements 1 and 2 assert that 1View is ready to scale up from its current number of countries, that is, that the system is prepared to handle a greater

8

volume of transactions than it is currently dealing with. Individual Statement 6 claims that 1View is presently capable of quickly integrating companies that UTi might acquire in the future. This is not the sort of generalized cheerleading that courts have classed as puffery.

The remaining Individual Statements—3, 4, 5, 7, 8, and 9—each use general language to describe 1View's performance. Such language does not make a statement immaterial as a matter of law. Rather, the question is whether a reasonable investor would understand them, in context, to communicate only a general optimism, or a factual representation about the actual condition of UTi's business and 1View's capabilities. *See generally Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014). Here, a reasonable investor would understand statements like "1View is working" in the context of UTi's other statements, made over a long period of time, describing what 1View did and what practical aims it was supposed to achieve. In context, these statements represented that 1View was doing the particular things UTi had told investors it was going to do.

With respect to Individual Statements 1, 2, 3, 5, 6, and 7, the defendants also invoke the PSLRA's safe harbor for forward-looking statements. The statements at issue are not forward-looking. Each incorporates an opinion about 1View's *then-existing capabilities*. It makes no difference if some of those opinions about then-present circumstances were expressed in the same breath as forward-looking

9

statements. "[W]here defendants make mixed statements . . . the non-forward-looking statements are not protected by the safe harbor." *In re Quality Sys., Inc. Sec. Litig.*, — F.3d —, 2017 WL 3203558, at \*7 (9th Cir. 2017). So in addition to the risk disclosures, we hold the individual statements were also actionably misleading.

## III.  Scienter

Scienter is "a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *City of Dearborn Heights*, 856 F.3d at 619 (citation and internal quotation marks omitted). Under the PSLRA, Cutler must "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2)(A). Scienter may be pled based on allegations attributed to confidential witnesses, so long as two conditions are met: "First, the confidential witnesses . . . must be described with sufficient particularity to establish their reliability and personal knowledge. Second, those statements which are reported . . . must themselves be indicative of scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009) (citations omitted).

CW15 is the key to Cutler's scienter allegations. As UTi's President of the Americas, CW15 was one of twelve people to participate in quarterly meetings of UTi's International Executive Board. He describes how UTi's senior management team kept abreast of 1View's progress. In that telling—which we have no reason to doubt is based on personal knowledge—a group of executives including Kirchner,

Feitzinger, and CFO Richard Rodick received an update on 1View's progress from UTi's Chief Information Officer at every single quarterly executive board meeting.

With respect to Kirchner, Rodick, and Feitzinger, CW15's description of quarterly updates on 1View's development brings this case within the "core operations" approach to pleading scienter. "[G]eneral allegations about management's role in a corporate structure and the importance of the corporate information about which management made . . . misleading statements" can satisfy the PSLRA when they "are buttressed with detailed and specific allegations about management's exposure to factual information within the company." *Zucco Partners*, 552 F.3d at 1000 (citations and internal quotation marks omitted).

Here, Cutler has alleged the prominent roles that Kirchner, Rodick, and Feitzinger played in UTi's corporate structure. Information about 1View's ability to generate invoices would have been tremendously important to UTi management. The company operated a low-margin business and made large outlays based on promises of reimbursement from its customers. It consequently depended on cash collections to stay afloat on a quarter-to-quarter basis, so prompt invoicing was critical. As to Kirchner, Rodick, and Feitzinger, CW15's recollection of the quarterly meetings is the "specific allegation about management's exposure to factual information," needed for a strong inference of scienter. The complaint, however, contains no allegations about Misakian's exposure to such information.

11

## IV.  Controlling Person Liability

Cutler also appeals from the dismissal of his claims under § 20(a) of the Exchange Act—the elements of which are 1) "a primary violation of federal securities law" and 2) a defendant who "exercised actual power or control over the primary violator." *Zucco Partners*, 552 F.3d at 990. (internal citation and quotation marks omitted). The district judge dismissed those claims for failure to plead a primary violation by UTi, several of which we have revived. The defendants concede that Cutler has alleged that Kirchner and Rodick were control persons, but are correct that Cutler has failed to plead any facts showing the same of Feitzinger or Misakian.

## CONCLUSION

The judgment of the district court is **REVERSED IN PART** to the extent it dismissed 1) Cutler's 10b-5 claims against UTi, Kirchner, Rodick, and Feitzinger, and 2) Cutler's § 20(a) claims against Kirchner and Rodick. The judgment is otherwise **AFFIRMED**, and the case **REMANDED** for further proceedings consistent with this opinion.[2]

---

[2] We deny as moot Cutler's motion for judicial notice of the contents of an order of the Securities and Exchange Commission, imposing a cease-and-desist order against defendants Eric Kirchner and Richard Rodick. Because we reinstate Cutler's claims against Kirchner and Rodick on the basis of the complaint alone, there is no reason to decide—without the benefit of full briefing— whether to take Cutler up on his invitation to consider the Commission's factual findings as if he had incorporated them by reference in the first instance. If Cutler wishes to add the Commission's findings to his complaint on remand, Federal Rule of Civil Procedure 15(a)(2) lets him ask the district judge for leave to do so.